### M. L. NAQUIN ET AL. v. TEXAS SAVINGS AND REAL ESTATE INVESTMENT ASSOCIATION.

#### No. 1077. Decided March 20, 1902.

**Vendor and Vendee—Installment Notes—Insurance—Rebuilding.**

Real estate was sold under a contract by which, on default in payment of any three of 120 installment notes for the purchase money, the agreement should be void and previous payments forfeited without notice, and the vendee was to keep the premises insured for vendor's benefit. While in default, the house was burned and insurance collected by the vendor, who applied it to replacing the building, over the protest of vendee, who demanded that it be credited on the purchase money, then only partly due and exceeding the amount of insurance. Held, that the insurance was not exclusively the fund of either party, but one in which they had a common interest for the accomplishment of a common purpose; that it was properly applied by the vendor to restoring the burned building, and it had a right to enforce its lien on the premises for the balance due on the debt; and that the vendee could not resist foreclosure by tendering the balance of the debt after applying the insurance money upon it without reimbursing the vendor the amount spent in restoring the building. (Pp. 316-320.)

Questions certified from the Court of Civil Appeals, First District, on writ of error from Harris County.

*Hutcheson, Campbell & Hutcheson,* for plaintiff in error.—Naquin purchased lot 6, involved in the suit, July 26, 1894, and immediately took possession and occupied it with his family as a home. It thereby became his homestead, subject only to unpaid purchase money. And

the right to demand a deed for this lot, upon the payment of ' one-fourth of the purchase money and interest, was a right vested immediately in Mrs. Naquin by virtue of it being their home, and M. L. Naquin could not, without being joined by his wife, make any contract with defendant in error to postpone or destroy or defeat the right to demand a deed upon paying one-fourth of the purchase price and interest, as per the contract of purchase. Wheatley v. Griffin, 60 Texas, 209; 15 Am. and Eng. Enc. of Law, 2 ed., 561, 668, 669; Morris v. Giesecke, 60 Texas, 633; Lessell v. Goodman, 96 Iowa, 681; Griffin v. Proctor, 14 Bush. (Ky.), 571; McKee v. Wilcox, 11 Mich., 359; Barber v. Bebel, 36 Cal., 11; Jenkins v. Simmons, 37 Kan., 496; Dunn v. Buckley, 56 Wis., 190; Blake v. McCosh, 91 Iowa, 544; Haggerty v. Brower, 105 Iowa, 395; McManus v. Campbell, 37 Texas, 217; Bartholomew v. West, 2 Dill. (U. S.), 293; Dotson v. Barnett, 41 S. W. Rep., 100; Persifull v. Hind, 11 S. W. Rep., 6; Cameron v. Gebhard, 85 Texas, 610; Brewing Co. v. Felder, 31 S. W. Rep., 524; Scott v. Dyer, 60 Texas, 137; Wilder v. Haughey, 21 Minn., 101; Hartman v. Munch, 21 Minn., 107; Timpson v. Richardson, 44 Iowa, 373; Parr v. Newberry, 73 Texas, 468; Lee v. Welborne, 71 Texas, 502; McShan v. Myers, 1 Texas U. C., 105; Lyon v. Ozee, 66 Texas, 95; Taylor v. Huck, 65 Texas, 238; Lyon v. Elser, 72 Texas, 305; Fullenwider v. Longmore, 73 Texas, 480; Huff v. Clark, 59 Texas, 347; Ricker v. Schadt, 23 S. W. Rep., 907.

Before a lien can be created on a homestead for improvements, there must be an express contract therefor in writing, joined in by his wife, and separately acknowledged. And the defendant in error, when he undertook to replace the house on the lot in controversy, that was burned, had no lien or security therefor on the lot, and the court had no authority to order the property sold to pay the amount so expended in rebuilding said house. The only amount for which that lot could be sold was for the balance of the purchase money due after crediting such amount with $800, insurance money collected. Same authorities, and the following: Batts' Rev. Stats., art. 3304, and cases cited thereunder; Freeman v. Hamblen, 21 S. W. Rep., 1019; Hargadene v. Whitfield, 71 Texas, 482.

When Naquin had paid defendant in error as much as one-fourth of $1600, with interest, according to the terms of the contract of sale made on the 26th day of July, 1894, the contract of sale was, from then on, an executed contract, and the company held after that only a vendor's lien for the balance of the purchase money. Moore v. Giesecke, 76 Texas, 547; Tom v. Wollhoefer, 61 Texas, 281; McCamly v. Waterhouse, 80 Texas, 342; Stitzle v. Evans, 74 Texas, 596; Gunst v. Pelham, 74 Texas, 586; Russell v. Kirkbridge, 62 Texas, 457; Whitlow v. Ogburn, 80 Texas, 239; Godfrey v. Anderson, 33 S. W. Rep., 997; Vance v. Hartzell, 4 Willson C. C., 282; Beer v. Landman, 88 Texas, 453; Carriage Co. v. Lusk, 33 S. W. Rep., 154; Benj. on Sales, 656-665; Scarbrough v. Arrant, 25 Texas, 129.

The plaintiff's rights in the premises are confined strictly to the rights of a vendor who has executed a deed to the land, retaining in such deed a vendor's lien. The rights of the association are strictly the rights of a vendor in an executory contract. Same authorities, and the following: McCamly v. Waterhouse, 80 Texas, 342, 343; Moore v. Giesecke, 76 Texas, 547; Tom v. Wollhoefer, 61 Texas, 281; Coddington v. Wells, 59 Texas, 49; Thomas v. Beaton, 25 Texas Supp., 321; Estes v. Browning, 11 Texas, 247; Stitzle v. Evans, 74 Texas, 596; Gunst v. Pelham, 74 Texas, 586; Russel v. Kirkbridge, 62 Texas, 457.

Under the pleadings and evidence, the trial court had no authority to order the sale of lot 6 to pay the company any sum of money; the tender of balance due in court prevented it. If Naquin had no interest in the lot, the company should have recovered the lot itself, and not a foreclosure on the lot.

The sale made to him in July, 1894, and the payment of the purchase money up to October, 1896, and the occupancy of the premises by Naquin, from the date of the purchase until the institution of this suit, matured in him not only an equitable interest in the lot, but a substantial fixed homestead right, that could only be divested out of him by deed duly executed by himself and wife, or by a lien duly procured under the statutes for creating liens on a homestead, or by foreclosure in a court for the balance of the unpaid purchase money.

*Ewing & Ring,* for defendant in error.—The legal and superior title to the property was in plaintiff below, and defendant below could only urge successfully such defenses as could commend themselves to the conscience of a court of equity.

There was an implied agreement, in the event of circumstances such as arose in this case, that the insurance money should be used for the restoration of the premises; or, at any rate, it was appellee's legal right to so use it, and appellant can not complain unless he can show it was inequitable to him to do so, and this the record conclusively gainsays.

Since, even if a deed had been executed, the retaining of the vendor's lien in same, as provided for by the instrument of date of July 26, 1894, would still have rendered the contract executory, plaintiff below, on default in the payment of any of said notes, and before the collection of the insurance money, had the right to go into peaceable possession of the property, and treat same as its own, and rebuild the improvements, and this regardless entirely of the provision in the contract to the effect that same should be forfeited without notice in the event of any three of the notes maturing and remaining unpaid at the same time. White v. Cole, 87 Texas, 500; Browning v. Estes, 3 Texas, 474; Dunlap v. Wright, 11 Texas, 603; Jones v. Hutchinson, 21 Texas, 376; Burgess v. Millican, 60 Texas, 401; Huffman v. Mulkey, 78 Texas, 562; Lanier v. Foust, 81 Texas, 189; Efron v. Burgower, 57 S. W. Rep., 306; Hamblen v. Folts, 70 Texas, 135; Pires v. Snodgrass, 91

Texas, 108; Walker v. Emerson, 20 Texas, 711; Scarbrough v. Arrant, .25 Texas, 129.

The contract to convey to Naquin was forfeited, since three of the notes referred to in same had become due and remained unpaid at the same time; nor was the provision of the contract in any way modified or affected by the fact that Naquin may have been entitled, previous to the forfeiture, to a deed. Lanier v. Foust, 81 Texas, 189; Land and Cattle Co. v. Boon, 73 Texas, 548.

The contract of 1894 being unambiguous in terms, and never having been modified in the interest of Naquin by any instrument in writing or otherwise, thus forcing a defense against the claim of forfeiture to rest entirely upon equitable grounds, and compelling Naquin to resort to equity for relief, he could not have equity meted out to him except on condition of doing equity; wherefore, since the court did not allow rescission or forfeiture, but enforced specific performance in favor of Naquin on condition only of his doing the minimum of obvious equity, he has no room for complaint in any view. Chaney v. Coleman, 77 Texas, 100, 102; Cattle Co. v. Boon, 73 Texas, 548, 556; White v. Cole, .87 Texas, 500; Hamblen v. Folts, 70 Texas, 132.

BROWN, Associate Justice.—The Court of Civil Appeals for the First Supreme Judicial District has certified to this court the following statement and questions:

"In this cause now pending before us on writ of error, the questions hereinafter certified have arisen upon the following state of facts:

"On the 28th day of July, 1894, the defendant in error executed and delivered to plaintiff in error the following contract of sale of real estate:

"'The State of Texas, County of Harris.—This memorandum of agreement made this 26th day of July, 1894, between the Texas Savings and Real Estate Investment Association and M. L. Naquin,

"'Witnesseth: That said Texas Savings and Real Estate Investment Association hereby agrees in consideration of $1 to it in hand paid and the payment of the further sum of $1600, with interest as hereinafter provided in monthly installments of $20 per month, including interest, hereafter to convey to said M. L. Naquin, of Houston, Harris County, .Texas, all that certain tract or parcel of land on the south side of Buffalo Bayou in the city of Houston, Harris County, Texas, known and described as lot number six (6) in block number five (5) of the Texas Savings and Real Estate Investment Association second addition to the said city of Houston; said lot fronting fifty (50) feet on Jackson street and running back for depth one hundred (100) feet between lines parallel with Drew avenue, together with all improvements situated thereon. Also agreeing that when one-fourth of said sum of $1600, together with interest thereon at the rate of 10 per cent per annum from date hereof, is paid, to execute and deliver to said M. L. Naquin

a good and sufficient deed retaining vendor's lien for balance of pur-
chase money and interest thereon.

" 'Said monthly payments are represented by one hundred and twenty
(120) promissory notes of even date herewith, each for the sum of $20,
with interest from maturity, the first of which notes is due and pay-
able on the first day of August, 1894, and one on the first day of each
and every month thereafter until all shall have become due.   It being
understood and agreed that should the said Naquin allow any three of
said monthly payments represented by said notes as aforesaid to be-
come due and remain unpaid at the same time, this agreement to con-
vey said property shall become null and void and all sums which shall
have been paid by the said Naquin shall be forfeited to and in favor
of said association without notice to the said Naquin.

" 'It is further agreed that the said Naquin shall keep the improve-
ments on said property insured for the benefit of said association in the
sum of not less than $500.   All taxes for the year 1894 are to be paid
by said association and all taxes thereafter to be assumed and paid by
said Naquin.

" 'Executed in duplicate.

" 'Accepted.   M. L. Naquin.

(Signed)

" 'TEXAS SAVINGS AND REAL ESTATE INVESTMENT ASSOCIATION.

" 'By E. L. Dennis, President.'

"Naquin, the plaintiff in error, executed the 120 notes prescribed by
the contract of sale and entered into possession of the premises.   He was
a married man and occupied the place as a home.

"There was a dwelling house on the lot at the date of the contract
of sale and this was insured in favor of the association for the sum of
$800, the policy also disclosing the interest of Naquin, and the pre-
miums were paid by the association and charged to Naquin.

"Fifty-three of the notes were paid by Naquin, the last one being
paid about February, 1898, but no deed was demanded by Naquin and
none was given, nor did the association exercise its right of rescission
on account of Naquin's default.   On May 21, 1899, the improvements
were practically destroyed by fire.   In the early part of August, 1899,
Naquin, who was in default in the payment of three or four notes at
the date of the fire, and who neither paid nor offered to pay any of the
notes thereafter, had an interview with the president of the association
and demanded that the association take the insurance money which it
collected and give him the lot, stating that he wanted his equities out
of it.   This the officers of the association refused to do, and thereafter
used $710.38 of the insurance money in restoring the house to its con-
dition prior to the fire.   When Naquin heard of the association's pur-
pose to rebuild, he saw the proper officer of the concern, protested
against the building of the house on the lot, stated that he did not want
to rebuild on it, and insisted that the insurance money be credited on
the debt.   The association refused all these demands and completed the

restoration of the improvements some time in October, 1899. It had treated the premises as its own from the date of the interview in which Naquin first demanded that the association take the insurance money and give him his equity in the transaction, but had never in terms exercised its right to declare the contract of sale annulled and rescinded, and at no time in terms notified Naquin of its purpose to do so. When Naquin demanded the credit of the insurance money on the debt and that he have his 'equities,' he did not tender the balance which would have been ultimately due thereon after the crediting of the insurance. Nor did he make tender of such balance appearing to be due after such credit until after the restoration of the improvements had been completed. He then renewed his demand that the $800 insurance be credited on his debt and tendered to the president of the association a sum amply sufficient to cover the amount which would have been due if such credit had been made, which tender was refused. Upon the completion of the improvements and after the association had advertised the premises for rent, Naquin, without the knowledge or consent of the association, took possession, whereupon the association, in December, 1899, brought this suit for the recovery of the lot, making Naquin and his wife defendants.

"Naquin answered, renewing his tender of 'the balance due after the credit of the insurance as demanded, and resisted the right of the association to use the insurance money in improving the premises without his consent. He and his wife also pleaded that the premises were their homestead and insisted that the amount expended by the association could not be made a lien upon the lot, because she had not so agreed in writing as required by law for the fixing of liens upon a homestead for the cost of improvements thereon.

"By the money expended, the premises were restored to their former condition and value. The lot as it stood after the fire and before the restoration was not worth the balance due less the insurance collected. The remains of the burnt house were worth about $300, if used in rebuilding the house, but were valueless unless so used, and Naquin showed no disposition to preserve the salvage by such use.

"If Naquin was entitled, under the facts, to have the insurance credited on the debt, the notes then due would have been largely overpaid and he would have been, at the date of his interview with the president of the association, in default as to none of them.

"The trial court rendered judgment against Naquin for $1107.40, the sum of $103.04 being included therein as sums expended by the association for taxes and insurance premiums. Decreed that if Naquin should pay such sums into the registry of the court within ninety days from that date, the premises should be his, otherwise they should be sold as under execution, the proceeds of sale to be applied to the payment of the judgment, the excess, if any, to be paid to Naquin. If insufficient to satisfy the judgment, execution to issue against Naquin for the balance.

. "Questions.—First. Under the facts as stated, did Naquin have the right to require that the insurance be credited on the debt?

"Second. For the preservation of its security, did the association have the right to use the insurance money in restoring the premises to their former condition and enforce the balance due on the debt as a lien on the premises?

. "Third. The insurance money having been actually placed in improvements on the premises, thus restoring them to their former condition and value, will equity enforce the contract of sale on the prayer of Naquin and his tender as made unless he offers to reimburse the association for the cost of restoring the premises?

"Fourth. Did the court err in rendering judgment as stated?"

. To the four questions propounded, we answer that, in its judgment, the trial court did not err to the prejudice of Naquin.

The insurance was not intended to provide a fund with which to pay the debt, but to furnish indemnity to both the mortgagor and the mortgagee. The object was to secure the mortgagor against being deprived of a home in case of the destruction of the house, for the fund would enable him to rebuild; and it was intended to secure him further against liability for the debt in case the destruction of the house should occur after the debt fell due. In favor of the mortgagee, the purpose was to indemnify his security upon the property; that is, it was to give additional security by providing a fund with which to discharge the debt, if overdue, or to restore the security by constructing a new building in place of that destroyed. It was not exclusively the fund of either party, but one in which they had a common interest for the accomplishment of a common purpose. Gordon v. Savings Bank, 115 Mass., 591; Fergus v. Wilmarth, 117 Ill., 547; Bryant v. Insurance Co., 24 Fed. Rep., 771; 1 Jones on Mort., sec. 410; 1 Biddle on Ins., sec. 256.

The debt not being due, the money collected upon the insurance policy could not be applied to its liquidation except by the consent of the creditor and the debtor. The debtor had no more right to demand the application of the money to the satisfaction of those installments which had not fallen due without the consent of the payee of the obligation than the payee had to apply it to the satisfaction of the unmatured indebtedness against the wishes of the mortgagor. The rights of the parties were reciprocal under the contract. In this situation, the purpose of the parties in creating the insurance out of which this fund arose was attained by a restoration of the house, thereby placing them in the same situation they were in before the fire. In a sense, the investment association held the money in trust for the payer, but with an interest of its own to be protected, and it could not be required to deliver over the fund to Naquin, for that would be to surrender its security for the unmatured debt. Duty did not permit it to serve its own interests only, nor require it to give up its rights to exclusively benefit the debtor, but required that it use the fund to carry out the purposes for which it was provided.

In the case of Gordon v. Bank, 115 Massachusetts, 591, the court expresses the rule of law which governs in such cases in the following language: "The insurance was for indemnity to the mortgagor as well as to the mortgagee. To the mortgagee, it was for protection of the security, not for payment of the debt. It was collateral to the debt. Money received from the insurance took the place of the property destroyed, and was still collateral until applied in payment by mutual consent, or by some exercise by the mortgagee of the right to demand payment of the debt, and upon default of payment, to convert the securities." In that case, there was a second mortgage upon the property not included in the indemnity of the insurance. The savings bank and Gordon, agreed to the investment of the fund in another house, but the second mortgagee insisted that the destruction of the property and the collection of the insurance was, in law, a satisfaction of the debt to the extent of the sum collected. While the case is not exactly in point with that now under consideration, we think it supports our conclusion in this case. The junior mortgagee had a right to have the money rightly applied for the protection of his interests, which could be done by discharging the first debt or by rebuilding the house. The bank was under obligation to the junior mortgagee to keep the money and apply it to the debt or to see that it was used to restore the security. That case establishes the character of the fund, from which springs the duty of the appellee to appellant and the right to protect itself as well as Naquin.

In Fergus v. Wilmarth, 117 Illinois, 547, the insurance was placed upon the house, and, by the insured, the policy was assigned to Fergus as trustee, to hold for the indemnity of a debt secured by mortgage upon the property. The house having been destroyed by fire, the trustee collected the fund and placed it in the bank to await a proper application of it under the trust. The creditor demanded the payment of the money upon his debt, which was not due. The debtor insisted upon building another house upon the ground. The trustee refused to turn the fund over to the mortgagor or to pay it to the mortgagee upon the debt, but agreed to pay it to the former whenever he should complete the building so that sufficient insurance could be had upon it to replace the indemnity to the mortgage that was afforded by that policy. The bank failed and a part of the money was lost. It was sought to hold the trustee liable. The Supreme Court of Illinois held that the trustee acted properly in the discharge of his duty and was not liable for the loss by failure of the bank. The principle decided in that case embraces the very heart and core of the question,—did the appellee properly apply the money by protecting the rights of both parties? We have answered that question in the preceding part of this opinion, but will restate the proposition briefly. Under the circumstances of the case, it was the duty of the appellee to use the fund for the best interests of both parties, which were best served by rebuilding the house, whereby the security was preserved intact for the indemnity of both.