Sarah Jane ENGLISH, Petitioner,

v.

Jerry E. FISCHER, and Alice Ann
Fischer, Respondents.

No. C–1908.

Supreme Court of Texas.

Nov. 9, 1983.

Rehearing Denied Dec. 14, 1983.

Hilgers, Watkins & Kazen, Thomas H. Watkins and David W. Hilgers, Austin, for petitioner.

Harris, Cook & Browning, James R. Harris and J. Norman Thomas, Corpus Christi, for respondents.

WALLACE, Justice.

This is a suit for damages by a homeowner against the mortgagee for failure to turn over the proceeds of a fire insurance policy in order to aid the homeowner in rebuilding after a fire. The trial court rendered judgment for the homeowner and the court of appeals affirmed, 649 S.W.2d 83. We reverse the judgments of the courts below and render judgment for the mortgagee.

Jerry Fischer and wife Alice (Fischer) purchased a home from Sarah Jane English (English) in 1967. Part of the consideration received by English was a promissory note for $62,500 secured by a lien on the house. In 1979 the house was partially destroyed by fire. Fischer requested that English endorse the insurance check to them for purposes of rebuilding. English verbally agreed to do so but after checking with her ex-husband decided not to. Both Mr. Fischer and English's ex-husband are attorneys. The repairs to the home were delayed for over a year. According to Fischer the delay was due to the inability to secure a loan to pay for the repairs without the insurance proceeds. The insurance company interpleaded the insurance proceeds of $110,000 into the registry of the court on January 10, 1980. On September 13, 1980, Fischer posted a bond and withdrew the insurance proceeds. The jury found that during the delay the cost of repair increased $127,616. The issues before us are: (1) whether Texas courts should imply a covenant of good faith and fair dealing in all contracts; (2) whether the deed of trust in this case provided for disposition of the insurance proceeds; (3) whether there was consideration for English's verbal agreement to endorse the insurance check; and (4) whether Fischer's cause of action came within the Deceptive Trade Practices Act.

## IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING

The court of appeals affirmed the trial court judgment and awarded Fischer judgment for $127,616. representing the increase in construction cost. A basis for the judgments below was the adoption of a novel theory of law enunciated only by California courts. That theory holds that in every contract there is an implied covenant that neither party will do anything which injures the right of the other party to receive the benefits of the agreement. The courts below call this a covenant of "good faith and fair dealing."

This concept is contrary to our well-reasoned and long-established adversary system which has served us ably in Texas for almost 150 years. Our system permits parties who have a dispute over a contract to present their case to an impartial tribunal for a determination of the agreement as made by the parties and embodied in the contract itself. To adopt the laudatory sounding theory of "good faith and fair dealing" would place a party under the onerous threat of treble damages should he seek to compel his adversary to perform according to the contract terms as agreed upon by the parties. The novel concept advocated by the courts below would abolish our system of government according to settled rules of law and let each case be decided upon what might seem "fair and in good faith," by each fact finder. This we are unwilling to do.

## DISBURSEMENT OF INSURANCE PROCEEDS

The contract between Fischer and English at the time of purchase of the house and lot in question consisted of a promissory note secured by a deed of trust. The deed of trust contained a provision which specifically covered the disbursement of insurance proceeds in the event of damage to the property. That provision states:

It is agreed and stipulated that ... (Fischer) ... shall keep said property fully insured in some company or compa-

nies approved by the holder of said indebtedness (English), to whom the loss, if any, shall be payable and by whom the policy shall be kept.

The parties thus specifically agreed to and embodied in their written contract that in the event of total or partial damage to the property the insurance proceeds would be paid to English. Fischer contends this provision speaks only to the possibility of a partial or full destruction of the property which would diminish its value to a sum less than that remaining unpaid on the indebtedness. It is clear from the wording of the provision that the contemplation of the parties was that the property was to be insured at its value, that English was to have possession of the insurance policy or policies and that *any loss payable under the policy or policies* was to be payable to English. The loss payable under the policies would not necessarily have any relation to the amount of the indebtedness, rather it would relate to the amount of insurance in force.

We hold that the parties specifically contracted for the disbursement of the proceeds of the fire insurance and that English was entitled to apply such proceeds to the indebtedness and pay the remainder to Fischer.

Fischer contends that *Naquin v. Texas Sav. & Real Estate Inv. Ass'n,* 95 Tex. 313, 67 S.W. 85, 87 (1902) is contrary to our holding. The two cases are distinguishable by the different provisions of the deeds of trust pertaining to insurance proceeds. In *Naquin* the deed of trust provides:

It is further agreed that the said Naquin shall keep the improvements on said property insured for the benefit of [the] association . . . .

Naquin sought to have the insurance proceeds used to liquidate the debt but the lien holder insisted upon rebuilding the house. This Court in determining the right of the parties in that particular case held that the Association was correct in rebuilding the house because they held the insurance proceeds for the benefit of both parties. In the present case the contract between the parties specifically provided that the proceeds were to be paid to English. Nowhere in the *Naquin* opinion did this Court suggest that the parties could not contract as to the disposition to be made on the insurance proceeds in the event of fire.

## CONSIDERATION FOR VERBAL AGREEMENT TO ENDORSE CHECK

By reply point Fischer urges that we should consider their contract theory of damages even though the court of appeals did not write on that point. In the interest of judicial economy we have agreed to do so.

Fischer contends that the verbal agreement of English to endorse the insurance check and deliver it to them was supported by consideration in that she would benefit by her collateral being increased in value as a result of the rebuilding. They further contend that their reliance on her promise to endorse the check and having the builder commence work toward rebuilding constituted promissory estoppel.

■ We will first consider the question of increase in value of the collateral. The note held by English had a balance of approximately $57,000 and bore interest at 5½% per annum. Fischer's suit asked for and the judgments below provided for $127,-616 for the increase in cost of repairs due to inflation. Fischer alleged that the rebuilding could not be commenced without the insurance proceeds because of high interest rates and lack of mortgage money. Fischer is contending on the one hand that a promissory note bearing interest at 5½% per annum secured by a lien on a house worth $200,000 when rebuilt would be of more benefit to English than $57,000 cash. On the other hand Fischer argues that they could not borrow money to rebuild the house because of high interest rates and inflation. The contradiction in the allegations is apparent. As a matter of law English received no consideration for making the verbal agreement to endorse the check.

We next consider the question of promissory estoppel. The requisites of promissory estoppel are: (1) a promise, (2) foreseeability of reliance thereon by the promisor, and (3) substantial reliance by the promisee to his detriment. *Aubrey v. Workman,* 384 S.W.2d 389, 393 (Tex.Civ. App.—Fort Worth 1964, writ ref'd n.r.e.). The record shows that the only acts taken by Fischer in reliance upon English's verbal agreement to endorse the check was to clean up some of the burned house in preparation for rebuilding. Everything done by Fischer would necessarily have been done whether the check was endorsed or not. Since Fischer proved no detrimental reliance on the promise by English the theory of promissory estoppel is not operable in this case.

### DECEPTIVE TRADE PRACTICES ACT

The trial court and the court of appeals were correct in denying Fischer's claim for damages under the Deceptive Trade Practices Act. The house was purchased in 1967 and only in regard to that transaction could Fischer be a consumer. Unless Fischer had been able to show some representation or warranty on the part of English which would have continued past the effective date of the DTPA (May 21, 1973), they are barred from any complaint as to the 1967 sale. *Woods v. Littleton,* 554 S.W.2d 662 (Tex.1977). What Fischer seeks in this action is the proceeds from an insurance policy which is neither "goods" nor "services." Therefore they are not consumers, *Riverside Nat'l Bank v. Lewis,* 603 S.W.2d 169 (Tex.1980).

The judgments of the courts below are reversed and judgment is rendered that respondents take nothing.

Dissenting opinion by KILGARLIN, J., in which RAY, J., joins.

SPEARS, Justice, concurring.

I agree with the majority's conclusion that an implied covenant of good faith and fair dealing does not override the express terms of this transaction. Hence, this case is consistent with *Naquin v. Texas Sav. & Real Estate Investment Ass'n,* 95 Tex. 313, 67 S.W. 85 (1902). In *Naquin,* as here, the court gave effect to the intent of the parties as reflected in the contract. The different result in *Naquin* stems from the different contractual provision.

I would note, however, that Texas courts have read a duty of good faith and fair dealing into many types of contractually-based transactions. The common thread among the cases in which courts have done so is a special relationship between the parties to the contract. That special relationship either arises from the element of trust necessary to accomplish the goals of the undertaking, or has been imposed by the courts because of an imbalance of bargaining power. Among the more familiar areas in which this duty has been recognized are: insurance, *Stowers Furniture Co. v. American Indemnity Co.,* 15 S.W.2d 544 (Tex. Comm'n App.1929, opinion adopted) (insurance company must make good faith effort to settle), *see also Massey v. Armco Steel Co.,* 652 S.W.2d 932 (Tex.1983); oil and gas, *Schlitter v. Smith,* 128 Tex. 628, 101 S.W.2d 543 (1937) (holder of executive rights owes duty of utmost fair dealing to holder of royalty interest), *see also Amoco Production Co. v. First Baptist Church of Pyote,* 611 S.W.2d 610 (Tex.1980) (implied covenant that lessee act in good faith in marketing gas); partnership, *Johnson v. Peckham,* 132 Tex. 148, 120 S.W.2d 786, 120 ALR 720 (1938) (partner purchasing other's partnership owes "the highest duty of honesty and fair dealing in making the trade"), *see also Morgan v. Arnold,* 441 S.W.2d 897 (Tex.Civ. App.—Dallas 1969, writ ref'd n.r.e.), *Inman v. Parr,* 311 S.W.2d 658 (Tex.Civ.App.— Beaumont 1958, writ ref'd n.r.e.); joint adventure, *Fitz-Gerald v. Hull,* 150 Tex. 39, 237 S.W.2d 256 (1951) (joint adventurers owe one another an obligation of utmost good faith); and agency, *Kinzbach Tool Co. v. Corbett-Wallace Corporation,* 138 Tex. 565, 160 S.W.2d 509 (1942) (good faith and fair dealing required from agent in every transaction on behalf of principal), *see also Anderson v. Griffith,* 501 S.W.2d 695 (Tex. Civ.App.—Fort Worth 1973, writ ref'd n.r.

e.). A similar duty applies to all contracts governed by the Uniform Commercial Code. *See* TEX.BUS. & COM.CODE ANN. § 1.203 (Tex.UCC) (Vernon 1968).

In all the cases cited above, the duty of good faith and fair dealing springs from the relationship, not from the contract; there may be other such relationships. In situations where the duty of good faith and fair dealing does exist, public policy would dictate that it cannot be disclaimed. On the other hand, the instant case involves a fairly negotiated contract between individuals. Moreover, there were attorneys as parties on both sides of the bargain. These parties were certainly capable of stating their agreement in its entirety. There is no reason to infer that they did not.

As I read the majority opinion, it has no effect on the cases cited above. As a result, I concur.

ROBERTSON, J., joins in this concurring opinion.

KILGARLIN, Justice, dissenting.

I respectfully dissent. Although I would reverse the judgments of the courts below, I strenuously believe that Texas should adhere to the concept that in every contract there is an implied covenant of good faith and fair dealing that neither party will do anything which injures the right of the other party to receive the benefits of the agreement. It is only because I believe that the trial court's instruction as to what constitutes good faith and fair dealing was erroneous that I would reverse the judgments below. However, instead of rendering judgment against the Fischers as the majority does, I would remand the case for another trial with the proper instruction.

The majority would have us believe that the concept of good faith and fair dealing is a novel theory of law, enunciated only by California courts. Surely the majority is cognizant of the Restatement (Second) of Contracts § 205 (1979), which states:

§ 205 Duty of Good Faith and Fair Dealing

Every contract imposes upon each party a duty of good faith and fair dealing in its performance and its enforcement.

Likewise, I would assume that the majority is equally familiar with Tex.Bus. & Com. Code Ann. § 1.203 (Tex.U.C.C.), which similarly states, "[e]very contract or duty within this title imposes an obligation of good faith in its performance or enforcement."

While the granting of damages for a breach of the implied covenant of good faith and fair dealing may be new to Texas law, the concept of how to distribute insurance proceeds is certainly not.

In *Naquin v. Texas Savings and Real Estate Investment Assoc.,* 95 Tex. 313, 67 S.W. 85 (1902), this Court stated:

Under the circumstances of the case, it was the duty of the appellee (the investment association) to use the fund for the best interest of both parties, which were best served by rebuilding the house, whereby the security was preserved intact for the indemnity of both.

67 S.W. at 87. Because of this pronouncement, the majority must attempt to distinguish *Naquin* from the case at bar. I see scant difference in the language in the *Naquin* deed of trust that the improvements on said property be kept insured for the benefit of the association and the language here that the property be kept fully insured and that the loss is payable to Mrs. English.

It is true that California courts have been active in applying the concept of good faith and fair dealing in contract cases. The California Supreme Court in *Comunale v. Traders & General Insurance Co.,* 50 Cal.2d 654, 658, 328 P.2d 198, 200 (1958), held that "[t]here is an implied covenant of good faith and fair dealing in every contract that neither party will do anything which will injure the right of the other to receive the benefits of the agreement." That principle was followed by another California Supreme Court in *Crisci v. The Security Insurance Company of New Haven, Connecticut,* 66 Cal.2d 425, 58 Cal.Rptr. 13, 426 P.2d 173 (1967).

Moreover, the concept of good faith and fair dealing in situations such as the one at

bar has been supported by at least one leading commentator, who states:

At least in the absence of mortgage provisions to the contrary, it would seem that in the modern standard mortgage policy context where the mortgage is not in default, the mortgagor normally should be able, where rebuilding is practical, to insist upon the application of the insurance proceeds to rebuild the premises. To be sure, to permit the mortgagor to defeat the mortgagee's right to recovery by rebuilding may force the mortgagee to litigate the extent and sufficiency of repairs. On the other hand, it is almost always the mortgagor who is paying the premiums on the casualty insurance policy. Moreover, while permitting the mortgagee to utilize the insurance proceeds to pay the mortgage debt presumably benefits the mortgagor by rendering the property free from the mortgage lien to the extent of the loss, in many cases the mortgagor probably cannot afford to rebuild or is unable to obtain new mortgage financing for that purpose. Thus, on balance, it would seem more equitable in most cases to permit the mortgagor to rebuild and have the insurance applied to that purpose.

Osbourne, Nelson and Whitman, *Real Estate Finance Law* (3d ed. 1979), § 4.15 at 150.

In this regard, it should be pointed out that at the time of the fire the Fischers were not in default on their mortgage payment. Moreover, it is uncontroverted that while the Fischers still owed Mrs. English $57,187.26 at the time of the fire the value of the property, even in its damaged state, was some $10,000 in excess of that amount owed. Therefore, there can be no question that Mrs. English was well protected.

The holding in *Naquin* is entirely consistent with the posture of most other jurisdictions. In a case involving damaged tugboats, Maryland's highest court in *Cottman Co. v. Continental Trust Co.,* 169 Md. 595, 182 A. 551 (1936), cited *Naquin* as authority in its decision. The Court observed that few cases have reached appellate courts where the use of insurance money for the repair and restoration of the security has been combated by the recipient mortgagee. The court stated:

The theory of insurance, however, does not contemplate a resulting profit to the insured, or his mortgagee or other creditor. The interest of the mortgagee is to maintain the equilibrium of debt and security; and if, by the application of the insurance money to the upkeep of the security, that parity would be continued, it is not inequitable to require the payee of the fund to transfer the same to the debtor for the purpose, upon properly safeguarding its application to that end.

182 A. at 554. In *Cottman,* as here, the mortgage did not specifically provide for the application of the proceeds of such insurance after payment to the trustee. Unlike the case at bar, Cottman, the tugboat owner, was able to pay for the repair from separate funds, and had requested the trustee to pay the insurance proceeds as reimbursement. The trust company refused to pay over the money, claiming the right to hold the insurance proceeds as a part of a fund for retirement of Cottman's debt. Cottman prevailed and the funds were ordered paid over to it.

In *Fergus v. Wilmarth,* 117 Ill. 542, 7 N.E. 508 (1886), as in *Cottman* and the case at bar, the mortgagor was not in default on the payment of the note. Fergus' property had been destroyed in the great Chicago fire, and his creditor, Wilmarth, wanted the insurance money credited to Fergus' indebtedness; Fergus wanted to acquire the money to rebuild. The Illinois Supreme Court concluded that the trustee should hold the insurance proceeds "until the new building should have progressed far enough to justify an expenditure of the fund and liquidating the cost of its erection." 7 N.E. at 510.

*Schoolcraft v. Ross,* 81 Cal.App.3d 75, 146 Cal.Rptr. 57 (Cal.App.1978) applied the concept of good faith and fair dealing to a situation exactly as the one before us. In *Schoolcraft,* the noteholder, Ross, had refused to sign over the insurance check to Schoolcraft, who desired to rebuild the

burned down premises. The California court stated, "[t]o the extent the security was not impaired, defendant Ross had no right to the funds." 146 Cal.Rptr. at 60. In a case closely resembling the one at bar, a New Jersey court adopted the good faith and fair dealing concept. *Starkman v. Sigmond,* 446 A.2d 1249, 184 N.J.Super. 600 (Ch.1982) citing *Schoolcraft, supra, Fergus, supra, Cottman Co., supra,* and the Osbourne treatise, *supra,* as precedent. It ruled that the mortgagee, Sigmond, was not entitled to receipt of the funds in order to pay off the outstanding indebtedness.

I therefore submit that rather than being a novel theory of law enunciated only by California courts, the principle that in every contract there is an implied covenant of good faith and fair dealing that neither party will do anything which injures the right of the other to receive the benefits of the agreement is now well established in American jurisprudence.

Having concluded that Mrs. English did owe the obligation of good faith and fair dealing to the Fischers, I would submit that nevertheless the judgments of the trial court and court of appeals should be reversed, but remanded for another trial. My reasoning is that I am of the opinion that special issue number four (the good faith and fair dealing issue) was erroneously submitted. That special issue reads as follows:

> Do you find from a preponderance of the evidence that Sarah Jane (Rylee) English, by refusing to endorse the insurance check (P–X 15) over to the Fischers, breached the implied warranty of good faith and fair dealing as hereinafter defined?
>
> > You are instructed that the "implied warranty" of "good faith and fair dealing," as used herein, requires that the mortgagee cooperate with the mortgagor so that any insurance funds would be used not to serve the sole interest of the mortgagee, but be used for the best interests of both the mortgagee and the mortgagor.
>
> Answer "We do" or "We do not."
>
> Answer: <u>We do</u>

I would first observe that the use of the word "warranty" was improper. "Covenant" would have been correct. More importantly, the instruction imposes a much greater burden upon English than good faith and fair dealing. It requires her cooperation with the Fischers to the extent that the insurance proceeds be used for the best interest of both. Texas Business and Commerce Code section 1.201, defines "good faith" as meaning "honesty in fact in the conduct or transaction concerned." Section 2.103 of the Code defines "good faith" in the case of a merchant as meaning "honesty in fact and the observance of reasonable commercial standards of fair dealing in the trade." Our courts, in construing the good faith requirement of the Code, have required a finding of bad faith before imposing liability. *See Richardson Co. v. First National Bank,* 504 S.W.2d 812 (Tex.Civ. App.—Tyler 1974, writ ref'd n.r.e.); *Riley v. First State Bank, Spearman,* 469 S.W.2d 812 (Tex.Civ.App.—Amarillo 1971, writ ref'd n.r.e.). Both of these cases have as authority a pre-Code case, *Quanah, A & P Ry. Co. v. Wichita State Bank and Trust Co.,* 127 Tex. 407, 93 S.W.2d 701 (1936). English's proffered instruction that she did not honestly believe she had a right to retain the insurance proceeds as payment on the debt would amount to such a bad faith test.

I would submit that should there be a retrial of this case, English's good faith and fair dealing should be measured by whether she honestly believed she had a right to retain the insurance proceeds. I hasten to note, however, that this standard should be for the determination of whether English is subject to consequential damages. Under the facts of this case, English had no right to retain the insurance proceeds and such should have been surrendered immediately to the Fischers, even though English was the named payee under the terms of the deed of trust.

Rather than being an iconoclast and destroying one hundred fifty years of Texas law, as portrayed by the majority, I would submit that I am only extending *Naquin* to

its logical consequences and adopting the modern, and majority, view of the law.

RAY, J., joins in this dissent.