02-10-019-CV
















 

 

 

 

COURT OF APPEALS

SECOND
DISTRICT OF TEXAS

FORT
WORTH

 

NO. 02-10-00019-CV

 

 


 
 
 JASON LYTLE
 
 
                                            APPELLANT
 
 


 

V.

 


 
 
 TEXAS WORKFORCE COMMISSION AND MORRELL
 CONSTRUCTION, INC.
 
 
                                            
 
 APPELLEES
 
 


 

 

------------

 

FROM THE 141ST DISTRICT COURT OF TARRANT
COUNTY

 

------------

 

MEMORANDUM OPINION[1]

 

------------

          Appellant Jason Lytle appeals the
trial court’s summary judgment in favor of Appellees
Texas Workforce Commission (“TWC”)[2]
and Morrell Construction, Inc. (“Construction”) on his suit for judicial review
from TWC’s determination that he was not entitled to
unemployment compensation benefits (“benefits”).  Because we hold that the trial court did not
err by granting summary judgment, we affirm.

Background

Construction
terminated Lytle’s employment, and Lytle filed a claim for benefits.  TWC notified
Construction of Lytle’s claim, and, in response, Construction sent a letter to TWC in which Construction’s president
Michael Morrell explained the reasons for Lytle’s termination.  He stated that on April 7, 2008, Lytle failed
to call or show up to work.  Someone from
the company had called Lytle “numerous times” during the day, but Lytle did not
answer or call back.

Morrell
then e-mailed Lytle shortly after 5 p.m., and Lytle responded by e-mail at 6:52
p.m. with a list of the hours he had worked that week but did not explain his
absence for that day.  Morrell stated
that he called Lytle when he received the e-mail, and “while starting to leave
a message on his voicemail, [Lytle] picked up the phone and began using profane
language.”  According to Morrell, Lytle
stated that his wife had been in an accident and his car “was broke.”  Morrell then “explained [to Lytle] that ‘all
you had to do was call,’” and “Lytle began yelling at [Morrell] and using very
vulgar and profane language and basically threatened [Morrell].”  Morrell thought over the situation for two
days and then made the decision to terminate Lytle’s employment.  Morrell concluded by stating that he felt
justified in terminating Lytle because of his failure to report to work, his
failure to communicate about why he would not be at work, and “the
inappropriate language and attitude [Lytle] displayed to the management and
other employees of [Construction].”

Construction
also submitted to TWC a letter from Starla Self, a Construction employee and Morrell’s
girlfriend, stating that on April 7, she and a friend were in the kitchen at
Morrell’s house when they heard Morrell on the telephone, and “[w]e could hear
that whoever he was on the phone with was screaming.”  She walked over to Morrell and recognized
Lytle’s voice as the person on the other end of the line.  She stated that when Morrell asked if Lytle
had quit, “[Lytle] yelled to [Morrell], ‘I don’t need your fucking shit, when I
quit you will know it baby, I will fuck you and your family!’”

TWC determined
that Lytle had been fired for inappropriate conduct and notified Lytle that it
could not pay him benefits.  The notice
stated that “[o]ur investigation found [that] your
employer fired you from your last work for inappropriate conduct on the
job.  Your employer had a reasonable
expectation that employees would conduct themselves in an orderly and safe manner.”

Lytle
appealed the decision to TWC’s appeals tribunal,
which held a hearing.  Before the
hearing, both Lytle and Morrell submitted phone records, which showed that
Morrell had called Lytle on the evening of April 7 and that Lytle had returned
his call a few minutes later.  Lytle
submitted a memo detailing what he viewed as discrepancies in Morrell’s version
of events.  He stated that although
Morrell claimed to begin to leave a voicemail message for him, only to have him
“[pick] up the phone and [begin] using profane language,” in fact the call
could not have happened this way because he has no way to answer his cell phone
to take a call once the call has transferred to voicemail.  He admitted that Morrell asked him if he had
quit, “and I responded I would let him know when I quit.”  Lytle did not mention whether he yelled at
Morrell but did state that Morrell yelled at him, asserting that “[d]uring the entire 4 minute conversation [Morrell] was
yelling and screaming. . . . I barely had any time to respond at all so I responded
after the call by e-mail.”  He stated
that Morrell had been looking for a reason to fire him “ever since I complained
when he provided me with [an IRS Form] 1099 when all along I was an employee,
not a subcontractor,” and that Morrell “made it very clear to me he was angry
when I disputed the 1099 in February.”

At
the hearing, Lytle stated that during the April 7 telephone conversation, Morrell
asked if he was quitting, and he said, “not at all” and that he would be back
at work on Wednesday, and that Morrell then became irate and began screaming at
him.  He denied threatening Morrell.  He stated that although Morrell contended that
he had fired him “for a no call/no show,” in fact “this all started” because
Lytle “blew the whistle on him to the IRS, and ever since then, things went
South.”

Morrell
testified that he had decided to terminate Lytle because when he asked Lytle if
he was quitting, Lytle “basically said, ‘[N]o, when I quit, you’re going to
fucking know it, you and your family, baby.’”  Self testified that she heard Lytle say, “I
don’t need your fucking shit, when I quit, you’ll know it baby, I will fuck you
and your family.”  Self’s friend Shelly Jewell
testified that she had also been at Morrell’s house on April 7 and that she and
Self “could hear somebody on the phone screaming.”

In
his written decision, the TWC hearing officer who had
conducted the hearing made a fact finding that on April 7, 2008, Morrell
reprimanded Lytle about his failure to show up to work, and Lytle “became upset
and talked back to [Morrell] in a loud, abusive manner” and that Morrell
discharged Lytle based on this event after considering the matter for two days.
 The hearing officer concluded that
Lytle’s conduct constituted insubordination “as well as misconduct” under labor
code sections 201.012 and 207.044.[3]

Lytle
filed for review by the TWC Commission, which
affirmed the findings of the Appeals Tribunal by a two-to-one vote.  Lytle then filed a petition for judicial
review of TWC’s determination.  Lytle alleged that he had been fired for
“blowing the whistle” on Construction for improperly classifying employees in
order to avoid tax obligations and that substantial evidence existed to show
that the hearing officer failed to follow TWC guidelines.  Lytle further argued that under Sabine Pilot,[4] an
employer cannot terminate an at-will employee if the sole reason for the
termination is employee’s refusal to perform an illegal act or “look the other
way.”  He denied threatening Morrell, and
he stated that Morrell had sent him an e-mail that was designed to provoke him.

Construction
and TWC filed a joint motion for summary judgment on
the ground that substantial evidence showed that Lytle had been disqualified
from receiving benefits because he had engaged in misconduct connected with his
work.  They argued that substantial
evidence supported TWC’s decision and that Lytle had
no evidence showing that TWC acted arbitrarily,
unreasonably, or capriciously.

After
Lytle responded to the motion, the trial court granted summary judgment
affirming TWC’s decision.  Lytle now appeals.

Standard of Review

Judicial
review of a TWC determination is by trial de novo
based on the substantial evidence rule.[5]  The trial court conducts an evidentiary trial
to “determine whether the agency’s ruling is free of the taint of any
illegality and is reasonably supported by substantial evidence.”[6]  In making this determination, the issue is
not whether TWC made the correct decision; rather, “the
issue is whether the evidence introduced before the trial court shows facts in
existence at the time of the [agency’s] decision that reasonably support the
decision,”[7] that
is, whether reasonable minds could have reached the same conclusion.[8]  Because substantial evidence is more than a
mere scintilla of evidence but less than a preponderance of evidence, the
evidence may preponderate against TWC’s decision but
still amount to substantial evidence.[9]  TWC remains the
primary factfinding body, and the reviewing court may
not substitute its judgment for TWC’s on controverted fact issues; the question before the trial
court is one of law.[10]

Trial
courts may grant summary judgments in cases tried under the substantial
evidence rule.[11]  Movants must show
that there is no genuine issue of material fact and that they are entitled to
judgment as a matter of law; we accept as true evidence favorable to the nonmovant and indulge in every reasonable inference and
resolve any doubts in the nonmovant’s favor.[12]

We
review the trial court’s judgment by comparing TWC’s
decision with the evidence presented to the trial court and the governing law.[13]  We determine whether the summary judgment
evidence established as a matter of law that substantial evidence existed to
support TWC’s decision.[14]

Unemployment Compensation Benefits

When
a person files for benefits through TWC, TWC notifies the person’s former employer.[15]  The employer then must inform TWC of any facts that may adversely affect the person’s
right to benefits.[16]  Failure to inform TWC
of such facts results in the employer’s waiver of all rights in connection with
the claim.[17]  An employee is disqualified from receiving benefits
if the employee was terminated for misconduct connected with the employee’s
work.[18]

Once
TWC makes a determination that the person is not
entitled to benefits, the person has the right to appeal the determination
through administrative proceedings, and after exhausting its administrative
remedies, to file a claim for judicial review in the trial court.[19]  A person filing a claim for judicial review
has the burden to establish that TWC’s determination
was unreasonable.[20]

Analysis

Lytle
presents three issues for review.  His
first two issues relate to the sufficiency of the evidence supporting TWC’s determination. 
In Lytle’s first issue, he argues that there is not substantial evidence
to support TWC’s decision to deny him benefits.  Specifically, he argues that TWC failed to consider Morrell’s renewed offer of
employment and that, under section 201.012(b), his behavior was not misconduct
because it was in reaction to an unconscionable act of his employer.

We
first consider Lytle’s second argument under this issue.  Section 201.012(a) of the labor code defines
“misconduct” as “mismanagement of a position of employment by action or
inaction, neglect that jeopardizes the life or property of another, intentional
wrongdoing or malfeasance, intentional violation of a law, or violation of a
policy or rule adopted to ensure the orderly work and the safety of employees.”[21]  Notwithstanding the definition in subsection
(a), subsection (b) provides that “[t]he term ‘misconduct’ does not include an
act in response to an unconscionable act of an employer or superior.”[22]

Case
law interpreting the definition of “misconduct” has not always been clear or
consistent.[23]  But any inconsistencies in the interpretation
of subsection (a) are irrelevant here because although Lytle argues that TWC and the trial court should have believed his testimony
that he did not threaten Morrell, he does not argue that talking back to his
employer “in a loud, abusive manner,” as TWC found he
had done, was not within the definition of “misconduct” under section
201.012(a).  Instead, he argues that substantial
evidence does not support the finding that this occurred because Construction’s
evidence was not credible.  He also
argues that any actions he did take were in response to Morrell’s e-mail, which
was a “provoking context” under section 201.012(b), and that therefore, under
that subsection, his response was not misconduct.

Lytle
is correct that the evidence admitted in the trial court shows that prior to
the telephone conversation with Morrell, Morrell had sent Lytle an e-mail that
contained profanity.  The e-mail, in its
entirety, states:

Jason,

 

I haven’t heard from
you all day today.  I’ve called and left
a couple of message[s] and also paged you. 
Sam also called you because we needed to settle up with the roofer and
wanted to know how many hours you spent on Collier.  I’m not sure if you quit or your [sic] just stiffing us on the job for today.  You was [sic]
supposed to bring some materials to the job Mike said.  So you don’t show up, don’t bring the materials[,] and don’t call me to let us know anything.  Sounds like you don’t give a shit about
working with us.  The economy sucks, it’s
cut throat out there, guys are bidding jobs for nothing[,] and I need everyone
on the team to give a hundred percent to get us through this time right
now.  And you pull this.  If your [sic] done then let[’]s
meet and settle up.  If your [sic] not I
can’t ever have this shit pulled again. 
Call me asap and let
me know.

 

Michael

 

That
the e-mail contained profanity is some evidence that Morrell does not find
profanity objectionable, but we cannot say that the e-mail was an
unconscionable act that would excuse Lytle’s reacting in an abusive
manner.  The record contains more than a
scintilla of evidence from which TWC reasonably could
have concluded that Lytle threatened Morrell, which was not a proportionate
response to Morrell’s use of profanity in his reprimand of Lytle.  Lytle argues that the threat was
“unconfirmed,” but it was only unconfirmed by him—there is more than a
scintilla of evidence of the threat in the record.  And despite Lytle’s assertion that TWC and the trial court should not have believed
Construction’s evidence, neither the trial court nor
this court may substitute its judgment for TWC’s on controverted issues of fact.[24]  Because some evidence supported TWC’s determination, we overrule this argument.

Lytle
also argues that TWC failed to include in its
determination that there was a renewed offer of employment and that promissory estoppel made the issue of whether he threatened Morrell
immaterial.  Lytle cites no authority in
support of his argument that promissory estoppel can
serve as the basis for benefits.[25]  Furthermore, even if e-mails telling an
employee that the employer would “call [him] tomorrow later in the morning to
see what’s going on with the weather and if [the employer is] going to be out
at the Bedford job” and another e-mail stating a date and time to show up for
work could constitute a promise of continued employment, Lytle points to no
evidence supporting a finding that he relied on any promise of continued
employment to his detriment.[26]  We overrule this argument and Lytle’s first
issue.

In
Lytle’s second issue, he contends that he was only fired for blowing the
whistle on Construction’s improperly classifying employees “for the purpose of
avoiding taxing authority contributions.” 
Thus, he argues, “[t]he evidence does not support the trial court’s
finding that [his] claims fail as a matter of law because the facts of employee
misclassification were not taken into account as established fact and [the] basis
for termination of employment.”  But
although the record contains evidence that at one point Lytle and Morrell disputed
whether Lytle should have been classified as an employee for only part of his
time working with Construction or for the entire working relationship, there is
no evidence that Lytle was terminated for being a whistle blower.

Lytle
told the hearing officer that he “blew the whistle on [Morrell] to the IRS, and
ever since then, things went South,” but he did not explain when he reported
Morrell to the IRS, what he reported to the IRS, or what the consequences to
Construction were, if any.  The only other
evidence of Lytle being a whistle blower is an interoffice memo of a TWC employee in its Tax Department’s Field Tax Operations
to another Tax Department employee, asking for an investigation of
Construction.  The memo states that “[w]e
have received a tattletale complaint that the subject
employer is not reporting employee’s wages to TWC.  The complainant is Jason Lytle.”  The memo is dated July 14, 2008, several
months after Construction had
terminated Lytle’s employment.  It
appears from other tax department interoffice e-mails in the record that the
investigation resulted in an assessment of $28.22 in taxes owed by Construction
and $10.60 in interest.  No evidence
supports the assertion that being assessed slightly less than $40 in taxes
caused Construction to fire Lytle, but even if the assessment angered
Construction, there is no evidence indicating that Lytle reported Construction
to any tax agency prior to his termination. 
Accordingly, there is no evidence that Lytle’s reporting Construction
led to his termination.[27]

Lytle
argues that he was more credible than Morrell, that a reasonable person would
not have concluded that Construction was credible, and that substantial
evidence exists that Lytle told the truth to TWC.  As stated above, the record contains
conflicting evidence about the events leading to Lytle’s termination.  But if the evidence would support either an
affirmative or negative finding, we must resolve any conflict in the evidence
in favor of the agency’s decision,[28] and
we may not substitute our judgment for TWC’s on controverted fact issues.[29]  While a reviewing court does not consider
“incredible, perjured, or unreasonable testimony because such evidence is not
substantial,”[30] Construction’s
evidence was not, on its face, incredible or unreasonable, and there was no
evidence or indication that it was perjured. 
We overrule Lytle’s second issue.

In Lytle’s
third issue, he contends that his legal counsel was ineffective.  The doctrine of ineffective assistance of
counsel does not extend to civil cases such as this one.[31]  Accordingly, we overrule Lytle’s third issue.

Conclusion

          Having overruled Lytle’s three issues,
we affirm the trial court’s judgment.

 

 

                                                                             LEE
ANN DAUPHINOT

                                                                             JUSTICE

 

PANEL: 
DAUPHINOT, MCCOY, and MEIER, JJ.

 

DELIVERED: 
December 2, 2010











[1]See Tex. R. App. P. 47.4.





[2]In
this opinion, TWC refers to the agency as a whole, not
the three members appointed by the governor to serve as the Texas Workforce
Commission.  See Tex. Lab. Code Ann. §
301.002 (Vernon 2006).  When referring to
this three-person body, we use the term “TWC
Commission.”





[3]Tex. Lab. Code Ann. §§
201.012, 207.044 (Vernon 2006).





[4]Sabine Pilot Serv., Inc. v.
Hauck, 687 S.W.2d 733, 734 (Tex. 1985).





[5]Tex. Lab. Code Ann. § 212.202(a) (Vernon 2006).





[6]Edwards v. Tex. Emp’t Comm’n, 936 S.W.2d 462, 465 (Tex. App.—Fort Worth 1996, no writ).





[7]Collingsworth Gen. Hosp. v. Hunnicutt, 988 S.W.2d 706,
708 (Tex. 1998).





[8]Edwards, 936 S.W.2d
at 465; see also Tex. Health Facilities Comm’n v. Charter
Med.-Dallas, Inc., 665 S.W.2d 446, 452 (Tex.
1984) (“The true test is not whether the agency reached the correct conclusion,
but whether some reasonable basis exists in the record for the action taken by
the agency.”).





[9]City of Houston v. Tippy, 991 S.W.2d 330, 334 (Tex. App.—Houston [1st Dist.] 1999, no
pet.); see also Tex. Health Facilities Comm’n, 665 S.W.2d at 452.





[10]Edwards, 936 S.W.2d at 465.





[11]Cruz v. City of San Antonio,
424 S.W.2d 45, 47 (Tex. Civ. App.––San Antonio 1968,
no writ); Jimison v. Tex. Workforce Comm’n,
No. 02-09-00127-CV, 2010 WL 851418, at *3 (Tex. App.—Fort Worth Mar. 11, 2010, no pet.) (mem. op.).





[12]Nixon v. Mr. Prop. Mgmt. Co., 690 S.W.2d 546, 548–49 (Tex. 1985).





[13]Potts v. Tex. Emp’t Comm’n, 884 S.W.2d 879, 882 (Tex. App.––Dallas 1994, no writ).





[14]Id. at 883.





[15]Tex. Lab. Code Ann. §
208.002 (Vernon 2006).





[16]Id. § 208.004 (Vernon
2006).





[17]Id.





[18]Tex.
Lab. Code Ann. § 207.044(a); see also id.
§ 201.012(a) (defining the
term “misconduct”).





[19]Id. §§ 212.053, 212.151,
212.203 (Vernon 2006).





[20]See id. § 212.202 (applying the
substantial evidence rule to judicial review of TWC’s
decision); Edwards, 936 S.W.2d at 465–66.





[21]Tex. Lab. Code Ann. § 201.012(a).





[22]Id.





[23]Compare Tex. Lab. Code Ann. § 201.012(a)
(providing a definition of misconduct that does not expressly include
insubordination) and Kellum v. Tex. Workforce Comm’n,
188 S.W.3d 411, 413–14 (Tex. App.—Dallas 2006, no
pet.) (noting that to be disqualified from receiving
benefits, the act of misconduct must fit within this narrowly-construed statutory
definition), with Anderson v. Tex. Workforce Comm’n, No. 05-02-01595-CV, 2003 WL 21350082, at *2
(Tex. App.—Dallas June 5, 2003, pet. denied) (mem.
op.) (concluding without discussion that insubordination is misconduct); compare Kellum,
188 S.W.3d at 414 (“To be misconduct, the policy
violated by the employee must be one adopted to ensure the orderly work and
safety of employees.”), with Mendicino v. Tex. Workforce Comm’n,
No. 03-05-00054-CV, 2006 WL 1358480, at *6 (Tex. App.—Austin May 19, 2006, pet.
denied) (mem. op.), cert. denied, 549 U.S. 1325 (2007) (concluding that employee’s
action of using a personal e-mail account for company business in violation of company
policy was misconduct without addressing whether the policy was adopted to
ensure orderly work or employee safety); compare
Mercer v. Ross, 701 S.W.2d 830, 831 (Tex. 1986)
(stating that the statute lists a number of acts that can be misconduct,
“including mismanagement and placing
in jeopardy the property of others”) (emphasis added), with Tex. Employment Comm’n v. Torres,
804 S.W.2d 213, 215 (Tex. App.—Corpus Christi 1991,
no writ) (construing Mercer as
holding that neglect is a way to commit mismanagement, not another type of
misconduct).





[24]See Tex. Health Facilities Comm’n, 665 S.W.2d
at 453.





[25]See Tex. R. App. P. 38.1(i).





[26]English v. Fischer, 660 S.W.2d 521, 524 (Tex. 1983) (noting that substantial reliance
by the promisee to his detriment is an element of
promissory estoppel).





[27]See, e.g., Jackson v. FedEx Ground Package Sys., Inc., No. 02-07-00246-CV,
2008 WL 1867931, at *6 (Tex. App.—Fort Worth Apr. 24, 2008, no pet.) (mem. op.) (holding
that employee had failed to produce controverting
evidence raising a fact issue as to her employer’s retaliatory motive in firing
her).





[28]Tex. Health Facilities Comm’n,
665 S.W.2d at 453.





[29]Id.





[30]Firemen’s & Policemen’s
Civil Serv. Comm’n v. Brinkmeyer,
662 S.W.2d 953, 956 (Tex. 1984).





[31]See McCoy v. Tex. Instruments, Inc., 183
S.W.3d 548, 553 (Tex. App.—Dallas 2006, no pet.).