**CITY OF HOUSTON, Texas, Appellant,**

v.

**James E. TIPPY and Texas Workforce Commission, Appellees.**

**No. 01–97–01429–CV.**

Court of Appeals of Texas,
Houston (1st Dist.).

April 1, 1999.

Rehearing Overruled May 14, 1999.

Marcus Dobbs, Houston, for appellant.

Anthony Aterno, Austin, W. Stacey Mooring, Houston, for appellee.

Panel consists of Chief Justice SCHNEIDER and Justices O'CONNOR and TAFT.

## OPINION

O'CONNOR, J.

The City of Houston, the appellant, appeals from the award of unemployment benefits by the Texas Workforce Commis-

sion (TWC),[1] the appellee, to James E. Tippy, also an appellee. We reverse and render judgment for the City.

## A. Factual Background

Tippy was a police officer for the Houston Police Department (HPD). As a police officer, he was responsible for knowing the laws, rules, and regulations governing police officers, including those in the rules manual of the HPD, and the City of Houston Civil Service Commission's Rules Governing Members of the Fire and Police Departments. Tippy was responsible for following these regulations and the general orders of his department.

Tippy began working for the HPD in 1983. In May 1994, the HPD internal affairs division began an investigation of Tippy's former partner. During the investigation, the HPD reviewed transcripts of the mobile digital terminal (MDT) transmissions sent between Tippy and his former partner. The MDT is the computer terminal used in the City's police cars. The transcripts revealed conversations between Tippy and his former partner in

which Tippy referred to a superior officer as a "guinea wop" (an ethnic slur against Italians), he referred to his superiors as a "bunch of zips," and he complained of a directive issued by "my stupid lieutenant."

The investigation of Tippy's former partner led to a review of Tippy's MDT transmissions over the entire month of March 1994. The review of Tippy's on-duty activities during that month revealed numerous violations of department policy, including habitual negligence in the performance of his duties and disrespect for his supervisors and fellow officers.

The internal affairs division sent Tippy a letter informing him of seventeen allegations against him.[2] Tippy was ordered to respond to the allegations, which he did. In September 1994, Tippy was fired by the chief of police. The police chief indicated by letter that he fired Tippy because of the allegations against him and because of his past record with the HPD.

## B. Procedural Background

Tippy filed a claim for and was awarded unemployment benefits by the TWC.[3] The

1. This case was originally styled as *The City of Houston, Texas v. James E. Tippy and Texas Employment Commission.* However, effective September 1, 1995, after the suit was filed, the Texas Employment Commission was renamed the Texas Workforce Commission. *See* Act of May 26, 1995, 74th Leg., R.S., ch. 655, § 11.75, 1995 Tex.Gen.Laws 3543, 3621–22. In this opinion, we refer to the TWC.

2. In addition to Tippy's use of racial slurs and misuse of the MDT system, the other allegations, and Tippy's response to them, can be summarized as follows:

   (1) Tippy did not sign on for duty within 20 minutes after the start of his shift on several occasions. Tippy said this was accepted practice because officers did not sign on until they were available to be dispatched for calls. He said there were a number of circumstances that would preclude him or any other officer from signing on within 20 minutes, such as a roll-call that ran late, returning telephone calls, picking up subpoenas, or waiting on the availability of a car because none was permanently assigned to him.

   (2) Tippy spent an excessive amount of time on several calls (the City gave specific dates and times). Tippy said the time he spent on these calls was within the average time spent according to the department's compiled statistics. He said there were circumstances to justify the time spent; therefore, he did not spend an excessive amount of time on any of the calls.

   (3) Tippy did not notify the dispatcher of a change in his location on at least three occasions. Tippy said he was never told he had to notify the dispatcher of a change in his location while out on a call, and he was always available by hand-held radio, car radio, MDT, or telephone.

   (4) Tippy ate lunch outside his assigned area. Tippy said he had permission to do so from his sergeant.

3. The statutory procedure for filing unemployment claims is as follows: An unemployed individual files a claim with the TWC. Tex.Lab.Code § 208.001(a). The TWC notifies the individual's previous employer of the claim. Tex.Lab.Code § 208.002(a). The employer must notify the TWC of any facts that

City appealed that decision, claiming Tippy was discharged for misconduct and, therefore, disqualified from receiving unemployment benefits.[4] A hearing was conducted before the Appeals Tribunal of the TWC. The hearing officer affirmed the award of unemployment benefits.

Of the 17 allegations of misconduct against Tippy, the hearing officer concluded only two were proven by the City—Tippy's use of an ethnic slur and a failure to adhere to police duty because he spent an excessive amount of time on the MDT for personal conversations.[5] The hearing officer concluded the evidence did not support a finding of misconduct to disqualify Tippy from receiving unemployment benefits under Section 207.044 of the Labor Code.

· The City appealed the decision of the Appeals Tribunal to the Commission.[6] The Commission affirmed in a 1–1 decision. The City appealed the TWC decision by filing suit in district court. Tippy and the TWC filed a motion for summary judgment, and the City filed a cross-motion for summary judgment. The trial court granted Tippy and the TWC's motion, and denied the City's. The City appeals the trial court's judgment.

The City presents two issues on appeal. First, the City argues there was not substantial evidence to support the TWC's decision. Second, the City asks this Court to decide whether the hearing officer followed the correct standard in determining whether Tippy should have been disqualified from receiving unemployment benefits.

## C. Analysis

### 1. *Trial court's standard of review*

■ The trial court reviews a TWC decision de novo to determine whether there is substantial evidence to support the TWC's decision. *Mercer v. Ross,* 701 S.W.2d 830, 831 (Tex.1986); *Morgan,* 877 S.W.2d at 13. The trial court may hear any evidence in existence at the time of the hearing before the Appeals Tribunal regardless of whether it was introduced at the hearing. *See Firemen's and Policemen's Civil Serv. Comm'n v. Brinkmeyer,* 662 S.W.2d 953, 956 (Tex.1984); *G.E. American Communication v. Galveston Cent. Appraisal Dist.,* 979 S.W.2d 761, 764 (Tex.App.—Houston [14th Dist.] 1998, no pet.). The determination of whether the TWC's decision was supported by substantial evidence is a question of law. *Arrellano v. Texas Employment Comm'n,* 810 S.W.2d 767, 770 (Tex.App.—San Antonio 1991, writ denied).

■ The TWC's ruling carries a presumption of validity, and the party seeking to set it aside has the burden to show it was not supported by substantial evidence.

---

may adversely affect the individual's claim. Tex.Lab.Code § 208.004(a). The TWC then makes an initial determination of whether the individual's claim for unemployment is valid. Tex.Lab.Code § 208.021.

A dissatisfied claimant or employer may appeal the TWC's initial determination to the Appeals Tribunal. Tex.Lab.Code § 212.101(a). The Appeals Tribunal consists of a salaried examiner (also called a hearing officer). Tex.Lab.Code § 212.101(b). Either the claimant or the employer may appeal the Appeals Tribunal's decision to the Commission. Tex.Lab.Code § 212.151. The Commission refers to the three gubernatorial appointees to the TWC. Tex.Lab.Code § 301.002.

**4.** An individual is entitled to unemployment benefits unless the individual was discharged for misconduct connected with his last work. Tex.Lab.Code § 207.044; *see also Texas Employment Comm'n v. Morgan,* 877 S.W.2d 11, 14 (Tex.App.—Houston [1st Dist.] 1994, no writ).

**5.** In reaching this conclusion, the hearing officer said,

[W]hile the claimant [Tippy] may have been a marginal police officer, the only allegations supported unquestionably by the evidence are his use of an ethnic slur and a failure to adhere to police duty by spending excessive time on the MDT on personal conversations.

**6.** The Commission refers to the three gubernatorial appointees to the TWC. Tex.Lab.Code § 301.002.

*Mercer,* 701 S.W.2d at 831; *Morgan,* 877 S.W.2d at 13. The trial court may not set aside a TWC decision merely because it would reach a different conclusion. *Mercer,* 701 S.W.2d at 831; *Morgan,* 877 S.W.2d at 13–14. It may do so only if it finds the TWC's decision was made without regard to the law or the facts, and, therefore, was unreasonable, arbitrary, or capricious. *Mercer,* 701 S.W.2d at 831; *Morgan,* 877 S.W.2d at 13–14.

### 2. *Summary judgment standard of review*

The summary judgment rule provides a method of summarily ending a case that involves only a question of law and no fact issues. Tex.R.Civ.P. 166a(c); *Nixon v. Mr. Property Management Co.,* 690 S.W.2d 546, 548 (Tex.1985); *Cigna Ins. Co. v. Rubalcada,* 960 S.W.2d 408, 411 (Tex. App.—Houston [1st Dist.] 1998, no pet.). When, as here, both sides move for summary judgment and the trial court grants one motion and denies the other, we review the summary judgment evidence presented by both sides and determine all questions presented. *See Commissioner's Ct. of Titus Cty. v. Agan,* 940 S.W.2d 77, 81 (Tex.1997); *Rubalcada,* 960 S.W.2d at 411–12. We render such judgment as the trial court should have rendered. *Agan,* 940 S.W.2d at 81; *Rubalcada,* 960 S.W.2d at 411–12.

Tippy and the TWC's motion for summary judgment asserted there was substantial evidence to support the decision to grant Tippy unemployment benefits. The City's cross-motion claimed it was entitled to judgment as a matter of law because the hearing officer applied the wrong standard in determining whether there was misconduct. Specifically, the City argued there was not substantial evidence to support the hearing officer's decision because, even though he also found Tippy committed two of the allegations against him, the hearing officer concluded Tippy was not discharged for misconduct.

By granting summary judgment to Tippy and the TWC, the trial court held there was substantial evidence to support the TWC's decision. We must determine whether Tippy and the TWC established there was substantial evidence to support the TWC's decision. We must look at the evidence presented to the trial court, and not the agency record by itself. *Nuernberg v. Texas Employment Comm'n,* 858 S.W.2d 364, 365 (Tex.1993); *Morgan,* 877 S.W.2d at 13. The record of the TWC's proceeding, which was admitted as summary judgment evidence without objection, was part of the evidence considered by the trial court.

### 3. *Substantial evidence*

When the trial court examines whether there is substantial evidence to support an agency's decision, it determines whether reasonable minds could have reached the same conclusion the TWC reached. *See Dotson v. Texas State Bd. of Med. Exam'r,* 612 S.W.2d 921, 922 (Tex. 1981); *Sanchez v. Huntsville I.S.D.,* 844 S.W.2d 286, 290 (Tex.App.—Houston [1st Dist.] 1992, no pet.). Substantial evidence is more than a mere scintilla, but less than a preponderance of the evidence; therefore, the evidence may preponderate against the TWC's decision but still amount to substantial evidence. *See Texas Health Facilities Comm'n v. Charter Medical–Dallas, Inc.,* 665 S.W.2d 446, 452 (Tex.1984); *Sanchez,* 844 S.W.2d at 290.

### 4. *Tippy and the TWC did not prove there was substantial evidence as a matter of law*

The following summary judgment evidence was presented to the trial court: a letter sent to Tippy from his sergeant detailing the allegations against Tippy, Tippy's letter responding to the allegations, the police chief's letter of indefinite suspension, the tapes and a full transcript of the hearing before the Ap-

peals Tribunal, Tippy's affidavit, and the Appeals Tribunal's findings.[7]

Tippy offered plausible explanations for most of the allegations against him, except the allegations regarding his personal messages over the MDT. Tippy sent unauthorized, personal messages over the MDT that included racial slurs (referring to a superior officer as a "guinea wop") and criticism of his supervisors (referring to his superiors as a "bunch of zips," and complaining of a directive issued by "my stupid lieutenant"). Tippy responded that his use of "guinea wop" was just a manner of referring to supervisors in general, and was not meant as an ethnic slur for either the sergeant or lieutenant for whom he worked, although they were Italian. Tippy believed the other comments he made did not constitute violations of the rules regarding respect for fellow employees, criticism of the department, or the use of racial slurs. Tippy also said he followed all lawful orders.

■ Tippy's explanation for using racial slurs, and his criticism of his superiors and the department, is not plausible considering he had a history of problems with an Italian sergeant and an Italian lieutenant. Tippy and the TWC attempt to distinguish between a racial and an ethnic slur, claiming that Tippy's statements were ethnic slurs, and, therefore, did not violate the rule. This argument is without merit. The HPD Rules Manual states, "No officer shall engage in any form of speech *likely to be construed* as a racial or religious slur or joke, whether in the presence of citizens or of other officers." Tippy's attempt to categorize "guinea wop" as an ethnic slur, as opposed to a racial slur, does not eliminate the fact that it is a phrase "likely to be construed" as a racial slur.

After reviewing the evidence before the trial court, we find that the hearing officer's decision was arbitrary and capricious because the hearing officer disregarded the law defining misconduct and the evidence of the HPD's rules. *See Mercer,* 701 S.W.2d at 831; *see also Morgan,* 877 S.W.2d at 13–14. Therefore, we conclude that the trial court erred by concluding there was substantial evidence to support the TWC's decision. *See Dotson,* 612 S.W.2d at 922; *Sanchez,* 844 S.W.2d at 290.

The hearing officer, and the trial court, ignored the evidence of the HPD rules and regulations.[8] The City and HPD had spe-

---

7. The City argues for the first time in its reply brief that the trial court should not have considered the written conclusions of the hearing officer because the conclusions were not evidence in existence at the time of the hearing. Specifically it attacks the hearing officer's opinion regarding Tippy's suspension. We agree that the trial court should not have considered this evidence because it was not in existence at the time of the hearing. *See Brinkmeyer,* 662 S.W.2d at 956. However, the City did not object to its admission as summary judgment evidence. Despite the fact that the City did not object to it, it is irrelevant to our decision, because we do not rely on the hearing officer's opinion regarding Tippy's suspension.

8. With regard to Tippy's use of ethnic slurs, the hearing officer said:

The evidence before the Appeals Tribunal establishes that the claimant knew, or was responsible for knowing, the rules, regulations, policies, and procedures governing his actions as a police officer for the City of Houston. The Appeals Tribunal finds that although the employer's General Orders restrict the use of the MDT system to 'necessary assigned duties,' it has become accepted past practice to use the system for personal communications as well. *Therefore, the mere use of the system for personal communications by the claimant, in and of itself, is insufficient to establish misconduct connected with the work....* The claimant's selection of the expression 'Ginny Whop' as a generic term for supervisors would have significantly greater credibility if he did not have a previous history of problems with a sergeant and lieutenant of Italian–American heritage. The claimant's inability to spell 'Guinea' or 'Wop' does not alter the significance of the comment as a racial slur.... *These expressions do not violate the regulations prohibiting criticism of the department, as they were neither made publicly nor at an internal official meeting as specified in the*

cific rules against the use of racial slurs, against misuse of the MDT system,[9] and against devoting on-duty time to any activity that is not directly related to the officer's police duties.[10]

■ The hearing officer also ignored the Labor Code's definition of misconduct: mismanagement of a position of employment by action or inaction, neglect that jeopardizes the life or property of another, intentional wrongdoing or malfeasance, intentional violation of a law, or *violation of a policy or rule adopted to ensure the orderly work and the safety of employees.* Tex.Lab.Code § 201.012(a) (emphasis added); *see also Morgan,* 877 S.W.2d at 14. The statute limits misconduct to the violation of a rule or policy "adopted to ensure the orderly work and the safety of employees." The rules against the use of racial slurs, against misuse of the MDT system, and against devoting on-duty time to any activity unrelated to police duty must fall within this category.

■ We recognize not every violation of an employer's personnel policy will trigger the denial of unemployment benefits. *Collingsworth Gen. Hosp. v. Hunnicutt,* 988 S.W.2d 706, 708 (Tex., 1998).[11] However, we must focus on the adverse impact of an employee's misconduct on an employer, and the purpose of the Unemployment Compensation Act. *Id.* at 709. The intent and purpose of the Unemploy-

ment Compensation Act is to provide compensation for workers who are unemployed through no fault of their own. *Id.* It is implausible to argue, as Tippy and the TWC do, that Tippy was not at fault.

We sustain the appellant's issue one.

We reverse the trial court's judgment and render judgment for the City.

---

*regulation.* While the expressions do clearly indicate disrespect for superior officers, the regulation also requires courtesy and civility which creates the inference that such regulation refers to personal conduct between the officer and superiors and associates, directly; *and no evidence was presented to establish that any direct verbal exchanges between the claimant and any other officers or supervisors created a violation of this rule....* However, the claimant's use of 5% to 13% of his work day on personal non-business related messages on his MDT does represent a violation of the regulations regarding adherence to police duty.

9. HPD General order 400–21 states any misuse of the MDT system will be considered

grounds for disciplinary action. It specifies that the MDT system is intended as an aid to classified employees in the performance of their assigned duties. It goes on to say employees shall limit their transactions and activities to necessary assigned duties.

10. Rule 2.9 of the HPD Rules Manual states officers shall not devote any of their on-duty time to any activity that is not directly related to the officer's police duties.

11. In *Collingsworth,* the issue was whether a nurse's violation of hospital policy while she was off-duty (she assaulted a woman) was misconduct "connected with" her last work. *Id.* at 709.