

# COURT OF APPEALS

### SECOND DISTRICT OF TEXAS
### FORT WORTH

## NO. 02-10-00019-CV

JASON LYTLE                                                              APPELLANT

V.

TEXAS WORKFORCE COMMISSION                                              APPELLEES
AND MORRELL CONSTRUCTION,
INC.

------------

FROM THE 141ST DISTRICT COURT OF TARRANT COUNTY

------------

## MEMORANDUM OPINION[1]

------------

Appellant Jason Lytle appeals the trial court's summary judgment in favor

of Appellees Texas Workforce Commission ("TWC")[2] and Morrell Construction,

---

[1]*See* Tex. R. App. P. 47.4.

[2]In this opinion, TWC refers to the agency as a whole, not the three members appointed by the governor to serve as the Texas Workforce Commission. *See* Tex. Lab. Code Ann. § 301.002 (Vernon 2006). When referring to this three-person body, we use the term "TWC Commission."

Inc. ("Construction") on his suit for judicial review from TWC's determination that he was not entitled to unemployment compensation benefits ("benefits"). Because we hold that the trial court did not err by granting summary judgment, we affirm.

**Background**

Construction terminated Lytle's employment, and Lytle filed a claim for benefits. TWC notified Construction of Lytle's claim, and, in response, Construction sent a letter to TWC in which Construction's president Michael Morrell explained the reasons for Lytle's termination. He stated that on April 7, 2008, Lytle failed to call or show up to work. Someone from the company had called Lytle "numerous times" during the day, but Lytle did not answer or call back.

Morrell then e-mailed Lytle shortly after 5 p.m., and Lytle responded by e-mail at 6:52 p.m. with a list of the hours he had worked that week but did not explain his absence for that day. Morrell stated that he called Lytle when he received the e-mail, and "while starting to leave a message on his voicemail, [Lytle] picked up the phone and began using profane language." According to Morrell, Lytle stated that his wife had been in an accident and his car "was broke." Morrell then "explained [to Lytle] that 'all you had to do was call,'" and "Lytle began yelling at [Morrell] and using very vulgar and profane language and basically threatened [Morrell]." Morrell thought over the situation for two days and then made the decision to terminate Lytle's employment. Morrell concluded

2

by stating that he felt justified in terminating Lytle because of his failure to report to work, his failure to communicate about why he would not be at work, and "the inappropriate language and attitude [Lytle] displayed to the management and other employees of [Construction]."

Construction also submitted to TWC a letter from Starla Self, a Construction employee and Morrell's girlfriend, stating that on April 7, she and a friend were in the kitchen at Morrell's house when they heard Morrell on the telephone, and "[w]e could hear that whoever he was on the phone with was screaming." She walked over to Morrell and recognized Lytle's voice as the person on the other end of the line. She stated that when Morrell asked if Lytle had quit, "[Lytle] yelled to [Morrell], 'I don't need your fucking shit, when I quit you will know it baby, I will fuck you and your family!'"

TWC determined that Lytle had been fired for inappropriate conduct and notified Lytle that it could not pay him benefits. The notice stated that "[o]ur investigation found [that] your employer fired you from your last work for inappropriate conduct on the job. Your employer had a reasonable expectation that employees would conduct themselves in an orderly and safe manner."

Lytle appealed the decision to TWC's appeals tribunal, which held a hearing. Before the hearing, both Lytle and Morrell submitted phone records, which showed that Morrell had called Lytle on the evening of April 7 and that Lytle had returned his call a few minutes later. Lytle submitted a memo detailing what he viewed as discrepancies in Morrell's version of events. He stated that

3

although Morrell claimed to begin to leave a voicemail message for him, only to have him "[pick] up the phone and [begin] using profane language," in fact the call could not have happened this way because he has no way to answer his cell phone to take a call once the call has transferred to voicemail. He admitted that Morrell asked him if he had quit, "and I responded I would let him know when I quit." Lytle did not mention whether he yelled at Morrell but did state that Morrell yelled at him, asserting that "[d]uring the entire 4 minute conversation [Morrell] was yelling and screaming. . . . I barely had any time to respond at all so I responded after the call by e-mail." He stated that Morrell had been looking for a reason to fire him "ever since I complained when he provided me with [an IRS Form] 1099 when all along I was an employee, not a subcontractor," and that Morrell "made it very clear to me he was angry when I disputed the 1099 in February."

At the hearing, Lytle stated that during the April 7 telephone conversation, Morrell asked if he was quitting, and he said, "not at all" and that he would be back at work on Wednesday, and that Morrell then became irate and began screaming at him. He denied threatening Morrell. He stated that although Morrell contended that he had fired him "for a no call/no show," in fact "this all started" because Lytle "blew the whistle on him to the IRS, and ever since then, things went South."

Morrell testified that he had decided to terminate Lytle because when he asked Lytle if he was quitting, Lytle "basically said, '[N]o, when I quit, you're

4

going to fucking know it, you and your family, baby.'" Self testified that she heard Lytle say, "I don't need your fucking shit, when I quit, you'll know it baby, I will fuck you and your family." Self's friend Shelly Jewell testified that she had also been at Morrell's house on April 7 and that she and Self "could hear somebody on the phone screaming."

In his written decision, the TWC hearing officer who had conducted the hearing made a fact finding that on April 7, 2008, Morrell reprimanded Lytle about his failure to show up to work, and Lytle "became upset and talked back to [Morrell] in a loud, abusive manner" and that Morrell discharged Lytle based on this event after considering the matter for two days. The hearing officer concluded that Lytle's conduct constituted insubordination "as well as misconduct" under labor code sections 201.012 and 207.044.[3]

Lytle filed for review by the TWC Commission, which affirmed the findings of the Appeals Tribunal by a two-to-one vote. Lytle then filed a petition for judicial review of TWC's determination. Lytle alleged that he had been fired for "blowing the whistle" on Construction for improperly classifying employees in order to avoid tax obligations and that substantial evidence existed to show that the hearing officer failed to follow TWC guidelines. Lytle further argued that under *Sabine Pilot*,[4] an employer cannot terminate an at-will employee if the sole

---

[3]Tex. Lab. Code Ann. §§ 201.012, 207.044 (Vernon 2006).

[4]*Sabine Pilot Serv., Inc. v. Hauck*, 687 S.W.2d 733, 734 (Tex. 1985).

5

reason for the termination is employee's refusal to perform an illegal act or "look the other way." He denied threatening Morrell, and he stated that Morrell had sent him an e-mail that was designed to provoke him.

Construction and TWC filed a joint motion for summary judgment on the ground that substantial evidence showed that Lytle had been disqualified from receiving benefits because he had engaged in misconduct connected with his work. They argued that substantial evidence supported TWC's decision and that Lytle had no evidence showing that TWC acted arbitrarily, unreasonably, or capriciously.

After Lytle responded to the motion, the trial court granted summary judgment affirming TWC's decision. Lytle now appeals.

## Standard of Review

Judicial review of a TWC determination is by trial de novo based on the substantial evidence rule.[5] The trial court conducts an evidentiary trial to "determine whether the agency's ruling is free of the taint of any illegality and is reasonably supported by substantial evidence."[6] In making this determination, the issue is not whether TWC made the correct decision; rather, "the issue is whether the evidence introduced before the trial court shows facts in existence at

---

[5]Tex. Lab. Code Ann. § 212.202(a) (Vernon 2006).

[6]*Edwards v. Tex. Emp't Comm'n*, 936 S.W.2d 462, 465 (Tex. App.—Fort Worth 1996, no writ).

the time of the [agency's] decision that reasonably support the decision,"[7] that is, whether reasonable minds could have reached the same conclusion.[8] Because substantial evidence is more than a mere scintilla of evidence but less than a preponderance of evidence, the evidence may preponderate against TWC's decision but still amount to substantial evidence.[9] TWC remains the primary factfinding body, and the reviewing court may not substitute its judgment for TWC's on controverted fact issues; the question before the trial court is one of law.[10]

Trial courts may grant summary judgments in cases tried under the substantial evidence rule.[11] Movants must show that there is no genuine issue of material fact and that they are entitled to judgment as a matter of law; we accept

---

[7]*Collingsworth Gen. Hosp. v. Hunnicutt*, 988 S.W.2d 706, 708 (Tex. 1998).

[8]*Edwards*, 936 S.W.2d at 465; *see also Tex. Health Facilities Comm'n v. Charter Med.-Dallas, Inc.*, 665 S.W.2d 446, 452 (Tex. 1984) ("The true test is not whether the agency reached the correct conclusion, but whether some reasonable basis exists in the record for the action taken by the agency.").

[9]*City of Houston v. Tippy*, 991 S.W.2d 330, 334 (Tex. App.—Houston [1st Dist.] 1999, no pet.); *see also Tex. Health Facilities Comm'n*, 665 S.W.2d at 452.

[10]*Edwards*, 936 S.W.2d at 465.

[11]*Cruz v. City of San Antonio*, 424 S.W.2d 45, 47 (Tex. Civ. App.—San Antonio 1968, no writ); *Jimison v. Tex. Workforce Comm'n*, No. 02-09-00127-CV, 2010 WL 851418, at *3 (Tex. App.—Fort Worth Mar. 11, 2010, no pet.) (mem. op.).

as true evidence favorable to the nonmovant and indulge in every reasonable inference and resolve any doubts in the nonmovant's favor.[12]

We review the trial court's judgment by comparing TWC's decision with the evidence presented to the trial court and the governing law.[13] We determine whether the summary judgment evidence established as a matter of law that substantial evidence existed to support TWC's decision.[14]

## Unemployment Compensation Benefits

When a person files for benefits through TWC, TWC notifies the person's former employer.[15] The employer then must inform TWC of any facts that may adversely affect the person's right to benefits.[16] Failure to inform TWC of such facts results in the employer's waiver of all rights in connection with the claim.[17] An employee is disqualified from receiving benefits if the employee was terminated for misconduct connected with the employee's work.[18]

---

[12]*Nixon v. Mr. Prop. Mgmt. Co.*, 690 S.W.2d 546, 548–49 (Tex. 1985).

[13]*Potts v. Tex. Emp't Comm'n*, 884 S.W.2d 879, 882 (Tex. App.—Dallas 1994, no writ).

[14]*Id.* at 883.

[15]Tex. Lab. Code Ann. § 208.002 (Vernon 2006).

[16]*Id.* § 208.004 (Vernon 2006).

[17]*Id.*

[18]Tex. Lab. Code Ann. § 207.044(a); *see also id.* § 201.012(a) (defining the term "misconduct").

8

Once TWC makes a determination that the person is not entitled to benefits, the person has the right to appeal the determination through administrative proceedings, and after exhausting its administrative remedies, to file a claim for judicial review in the trial court.[19] A person filing a claim for judicial review has the burden to establish that TWC's determination was unreasonable.[20]

**Analysis**

Lytle presents three issues for review. His first two issues relate to the sufficiency of the evidence supporting TWC's determination. In Lytle's first issue, he argues that there is not substantial evidence to support TWC's decision to deny him benefits. Specifically, he argues that TWC failed to consider Morrell's renewed offer of employment and that, under section 201.012(b), his behavior was not misconduct because it was in reaction to an unconscionable act of his employer.

We first consider Lytle's second argument under this issue. Section 201.012(a) of the labor code defines "misconduct" as "mismanagement of a position of employment by action or inaction, neglect that jeopardizes the life or property of another, intentional wrongdoing or malfeasance, intentional violation of a law, or violation of a policy or rule adopted to ensure the orderly work and

---

[19]*Id.* §§ 212.053, 212.151, 212.203 (Vernon 2006).

[20]*See id.* § 212.202 (applying the substantial evidence rule to judicial review of TWC's decision); *Edwards*, 936 S.W.2d at 465–66.

9

the safety of employees."[21]   Notwithstanding the definition in subsection (a),

subsection (b) provides that "[t]he term 'misconduct' does not include an act in

response to an unconscionable act of an employer or superior."[22]

Case law interpreting the definition of "misconduct" has not always been

clear or consistent.[23]   But any inconsistencies in the interpretation of subsection

(a) are irrelevant here because although Lytle argues that TWC and the trial

court should have believed his testimony that he did not threaten Morrell, he

does not argue that talking back to his employer "in a loud, abusive manner," as

---

[21]Tex. Lab. Code Ann. § 201.012(a).

[22]*Id.*

[23]*Compare* Tex. Lab. Code Ann. § 201.012(a) (providing a definition of misconduct that does not expressly include insubordination) *and Kellum v. Tex. Workforce Comm'n*, 188 S.W.3d 411, 413–14 (Tex. App.—Dallas 2006, no pet.) (noting that to be disqualified from receiving benefits, the act of misconduct must fit within this narrowly-construed statutory definition), *with Anderson v. Tex. Workforce Comm'n*, No. 05-02-01595-CV, 2003 WL 21350082, at *2 (Tex. App.—Dallas June 5, 2003, pet. denied) (mem. op.) (concluding without discussion that insubordination is misconduct); *compare Kellum*, 188 S.W.3d at 414 ("To be misconduct, the policy violated by the employee must be one adopted to ensure the orderly work and safety of employees."), *with Mendicino v. Tex. Workforce Comm'n*, No. 03-05-00054-CV, 2006 WL 1358480, at *6 (Tex. App.—Austin May 19, 2006, pet. denied) (mem. op.), *cert. denied*, 549 U.S. 1325 (2007) (concluding that employee's action of using a personal e-mail account for company business in violation of company policy was misconduct without addressing whether the policy was adopted to ensure orderly work or employee safety); *compare Mercer v. Ross*, 701 S.W.2d 830, 831 (Tex. 1986) (stating that the statute lists a number of acts that can be misconduct, "including mismanagement *and* placing in jeopardy the property of others") (emphasis added), *with Tex. Employment Comm'n v. Torres*, 804 S.W.2d 213, 215 (Tex. App.—Corpus Christi 1991, no writ) (construing *Mercer* as holding that neglect is a way to commit mismanagement, not another type of misconduct).

TWC found he had done, was not within the definition of "misconduct" under section 201.012(a). Instead, he argues that substantial evidence does not support the finding that this occurred because Construction's evidence was not credible. He also argues that any actions he did take were in response to Morrell's e-mail, which was a "provoking context" under section 201.012(b), and that therefore, under that subsection, his response was not misconduct.

Lytle is correct that the evidence admitted in the trial court shows that prior to the telephone conversation with Morrell, Morrell had sent Lytle an e-mail that contained profanity. The e-mail, in its entirety, states:

> Jason,
>
> I haven't heard from you all day today. I've called and left a couple of message[s] and also paged you. Sam also called you because we needed to settle up with the roofer and wanted to know how many hours you spent on Collier. I'm not sure if you quit or your [sic] just stiffing us on the job for today. You was [sic] supposed to bring some materials to the job Mike said. So you don't show up, don't bring the materials[,] and don't call me to let us know anything. Sounds like you don't give a shit about working with us. The economy sucks, it's cut throat out there, guys are bidding jobs for nothing[,] and I need everyone on the team to give a hundred percent to get us through this time right now. And you pull this. If your [sic] done then let[']s meet and settle up. If your [sic] not I can't ever have this shit pulled again. Call me asap and let me know.
>
> Michael

That the e-mail contained profanity is some evidence that Morrell does not find profanity objectionable, but we cannot say that the e-mail was an unconscionable act that would excuse Lytle's reacting in an abusive manner. The record contains more than a scintilla of evidence from which TWC reasonably could

11

have concluded that Lytle threatened Morrell, which was not a proportionate response to Morrell's use of profanity in his reprimand of Lytle. Lytle argues that the threat was "unconfirmed," but it was only unconfirmed by him—there is more than a scintilla of evidence of the threat in the record. And despite Lytle's assertion that TWC and the trial court should not have believed Construction's evidence, neither the trial court nor this court may substitute its judgment for TWC's on controverted issues of fact.[24] Because some evidence supported TWC's determination, we overrule this argument.

Lytle also argues that TWC failed to include in its determination that there was a renewed offer of employment and that promissory estoppel made the issue of whether he threatened Morrell immaterial. Lytle cites no authority in support of his argument that promissory estoppel can serve as the basis for benefits.[25] Furthermore, even if e-mails telling an employee that the employer would "call [him] tomorrow later in the morning to see what's going on with the weather and if [the employer is] going to be out at the Bedford job" and another e-mail stating a date and time to show up for work could constitute a promise of continued employment, Lytle points to no evidence supporting a finding that he

---

[24]*See Tex. Health Facilities Comm'n*, 665 S.W.2d at 453.

[25]*See* Tex. R. App. P. 38.1(i).

relied on any promise of continued employment to his detriment.[26]   We overrule this argument and Lytle's first issue.

In Lytle's second issue, he contends that he was only fired for blowing the whistle on Construction's improperly classifying employees "for the purpose of avoiding taxing authority contributions."   Thus, he argues, "[t]he evidence does not support the trial court's finding that [his] claims fail as a matter of law because the facts of employee misclassification were not taken into account as established fact and [the] basis for termination of employment."   But although the record contains evidence that at one point Lytle and Morrell disputed whether Lytle should have been classified as an employee for only part of his time working with Construction or for the entire working relationship, there is no evidence that Lytle was terminated for being a whistle blower.

Lytle told the hearing officer that he "blew the whistle on [Morrell] to the IRS, and ever since then, things went South," but he did not explain when he reported Morrell to the IRS, what he reported to the IRS, or what the consequences to Construction were, if any.   The only other evidence of Lytle being a whistle blower is an interoffice memo of a TWC employee in its Tax Department's Field Tax Operations to another Tax Department employee, asking for an investigation of Construction.   The memo states that "[w]e have received a

---

[26]*English v. Fischer*, 660 S.W.2d 521, 524 (Tex. 1983) (noting that substantial reliance by the promisee to his detriment is an element of promissory estoppel).

13

tattletale complaint that the subject employer is not reporting employee's wages to TWC. The complainant is Jason Lytle." The memo is dated July 14, 2008, several months *after* Construction had terminated Lytle's employment. It appears from other tax department interoffice e-mails in the record that the investigation resulted in an assessment of $28.22 in taxes owed by Construction and $10.60 in interest. No evidence supports the assertion that being assessed slightly less than $40 in taxes caused Construction to fire Lytle, but even if the assessment angered Construction, there is no evidence indicating that Lytle reported Construction to any tax agency prior to his termination. Accordingly, there is no evidence that Lytle's reporting Construction led to his termination.[27]

Lytle argues that he was more credible than Morrell, that a reasonable person would not have concluded that Construction was credible, and that substantial evidence exists that Lytle told the truth to TWC. As stated above, the record contains conflicting evidence about the events leading to Lytle's termination. But if the evidence would support either an affirmative or negative finding, we must resolve any conflict in the evidence in favor of the agency's decision,[28] and we may not substitute our judgment for TWC's on controverted

---

[27] *See, e.g.*, *Jackson v. FedEx Ground Package Sys., Inc.*, No. 02-07-00246-CV, 2008 WL 1867931, at *6 (Tex. App.—Fort Worth Apr. 24, 2008, no pet.) (mem. op.) (holding that employee had failed to produce controverting evidence raising a fact issue as to her employer's retaliatory motive in firing her).

[28] *Tex. Health Facilities Comm'n*, 665 S.W.2d at 453.

fact issues.[29] While a reviewing court does not consider "incredible, perjured, or unreasonable testimony because such evidence is not substantial,"[30] Construction's evidence was not, on its face, incredible or unreasonable, and there was no evidence or indication that it was perjured. We overrule Lytle's second issue.

In Lytle's third issue, he contends that his legal counsel was ineffective. The doctrine of ineffective assistance of counsel does not extend to civil cases such as this one.[31] Accordingly, we overrule Lytle's third issue.

## Conclusion

Having overruled Lytle's three issues, we affirm the trial court's judgment.

LEE ANN DAUPHINOT
JUSTICE

PANEL: DAUPHINOT, MCCOY, and MEIER, JJ.

DELIVERED: December 2, 2010

---

[29] *Id.*

[30] *Firemen's & Policemen's Civil Serv. Comm'n v. Brinkmeyer*, 662 S.W.2d 953, 956 (Tex. 1984).

[31] *See McCoy v. Tex. Instruments, Inc.*, 183 S.W.3d 548, 553 (Tex. App.— Dallas 2006, no pet.).