

# COURT OF APPEALS
### SECOND DISTRICT OF TEXAS
### FORT WORTH

### NO. 02-12-00358-CV

VIOLETA PASKAUSKIENE                                              APPELLANT

V.

TEXAS WORKFORCE                                                   APPELLEES
COMMISSION & MICROCONSULT,
INC.

----------

## FROM THE 96TH DISTRICT COURT OF TARRANT COUNTY

----------

## MEMORANDUM OPINION[1]

----------

Violeta Paskauskiene appeals from a summary judgment upholding the Texas Workforce Commission's (TWC) denial of her application for unemployment benefits. In four issues, she contends that the trial court erred by denying her a jury trial, that the trial court erred by refusing to deem admitted requests for admissions she sent to TWC, that the trial court erred by granting

---

[1]*See* Tex. R. App. P. 47.4.

TWC's motion for summary judgment and denying hers, and that TWC's decision to deny her benefits was not supported by substantial evidence that she committed workplace misconduct. We affirm.[2]

## Factual Background

Paskauskiene was employed by Microconsult, Inc. to, among other things, review testing results for products. Microconsult terminated her employment on March 7, 2011, and she applied to TWC for unemployment benefits. Microconsult contested her right to receive benefits, and a TWC hearing officer determined that she was ineligible to receive benefits because Microconsult terminated her for misconduct related to her work. Although Paskauskiene exhausted her agency appeals, TWC continued to deny her benefits. Accordingly, she sued TWC and Microconsult in district court challenging TWC's decision. TWC and Microconsult filed a joint motion for summary judgment, and Paskauskiene filed a competing motion for summary judgment. The trial court granted TWC and Microconsult's motion and denied Paskauskiene's in a final judgment, which she now appeals.[3]

---

[2]We deny TWC's motion to dismiss the appeal for procedural defects in Paskauskiene's brief. *See* Tex. R. App. P. 38.9(a).

[3]Microconsult settled a federal suit brought against it by Paskauskiene, and as part of the settlement, withdrew its challenge to her claim for benefits, without prejudice to TWC's right to defend its decision. Thus, only TWC filed an appellee's brief in this appeal.

## Requests for Admissions

In her second issue, Paskauskiene claims that the trial court erred by refusing to deem admitted requests for admissions that she sent to TWC. Paskauskiene served the requests on TWC's counsel by facsimile on February 7, 2012 at 5:35 p.m. TWC's counsel mailed responses to the requests on March 9, 2012.

Rule 198.2 provides that "[t]he responding party must serve a written response [to requests for admissions] on the requesting party within 30 days after service of the request." Tex. R. Civ. P. 198.2(a). If a response is not timely served, the request is considered admitted without the necessity of a court order. Tex. R. Civ. P. 198.2(c). Documents served after 5:00 p.m. of the local time of the recipient are deemed served the following day.[4] Tex. R. Civ. P. 21a. Thus, Paskauskiene's requests were deemed served February 8, 2012, and TWC's responses were due March 9, 2012. The record contains a certificate of service showing that TWC's counsel mailed the responses to Paskauskiene by first class mail on March 9, 2012. Because proper service by mail is complete upon mailing and because Paskauskiene received the responses on March 11, 2012, within three days of mailing, TWC's responses were timely and thus not admitted. *See id.*; *Mathis v. Lockwood*, 166 S.W.3d 743, 745 (Tex. 2005) (providing that

---

[4]Paskauskiene says in her brief that the admissions were served at 5:35 p.m. Eastern Standard time, but the fax confirmation shows that the requests were sent from an 817 number, the area code for Tarrant County, Texas, in the Central Standard time zone. *See* Tex. R. Evid. 201(b).

attorney's certificate of service is prima facie evidence of service of a notice). We overrule Paskauskiene's second issue.

## Propriety of Summary Judgment for TWC

In her third issue, Paskauskiene argues that her constitutional rights were violated when the trial court granted TWC's motion for summary judgment and denied hers. In her fourth issue, she contends that TWC's decision to deny her benefits is not supported by substantial evidence. Because both of these issues relate to the propriety of the trial court's granting summary judgment, we consider these issues together.

### Standard of Review

Judicial review of a TWC decision is "by trial de novo based on the substantial evidence rule." Tex. Lab. Code Ann. § 212.202(a) (West 2006). This means that the trial court must determine whether there is substantial evidence to support TWC's ruling. *Mercer v. Ross*, 701 S.W.2d 830, 831 (Tex. 1986); *Int'l Union, United Auto., Aerospace & Agric. Implement Workers of Am.-UAW v. Gen. Motors Corp.*, 104 S.W.3d 126, 129 (Tex. App.—Fort Worth 2003, no pet.). This issue is strictly one of law; the administrative agency is the primary fact-finding body. *Firemen's & Policemen's Civil Serv. Comm'n v. Brinkmeyer*, 662 S.W.2d 953, 956 (Tex. 1984); *Int'l Union*, 104 S.W.3d at 129. Summary judgment is proper in an appeal to the trial court based on a substantial evidence review because the only issue before the trial court is a question of law. *City of*

4

*Arlington v. Centerfolds, Inc.*, 232 S.W.3d 238, 243 (Tex. App.—Fort Worth 2007, pet. denied).

Substantial evidence is more than a scintilla, but less than a preponderance of the evidence. *Blanchard v. Brazos Forest Prods., L.P.*, 353 S.W.3d 569, 572 (Tex. App.—Fort Worth 2011, pet. denied); *City of Houston v. Tippy*, 991 S.W.2d 330, 334 (Tex. App.—Houston [1st Dist.] 1999, no pet.). Under a substantial evidence review, the issue is whether the evidence introduced before the trial court reveals facts in existence at the time of TWC's ruling that reasonably support the decision made by the TWC tribunal, that is, whether reasonable minds could have reached the same conclusion. *Collingsworth Gen. Hosp. v. Hunnicutt*, 988 S.W.2d 706, 708 (Tex. 1998). The issue is not whether TWC's decision was correct. *Blanchard*, 353 S.W.3d at 572. Even when an agency's decision is shown to be against the great weight and preponderance of the evidence, a reviewing court is bound, as a matter of law, to affirm the agency decision so long as a reasonable person could have reached the conclusion at which the agency arrived. *Tex. Workforce Comm'n v. BL II Logistics, L.L.C.*, 237 S.W.3d 875, 878–79 (Tex. App.—Texarkana 2007, no pet.). The trial court may set aside a TWC decision only if it determines that the decision was made without regard to the law or the facts and, therefore, was unreasonable, arbitrary, or capricious. *Mercer*, 701 S.W.2d at 831.

A TWC decision regarding unemployment benefit payments carries a presumption of validity. *Collingsworth Gen. Hosp.*, 988 S.W.2d at 708. The

5

burden is on the party seeking to set aside a TWC decision to prove that the ruling is not supported by substantial evidence. *Mercer*, 701 S.W.2d at 831. We look at the evidence presented to the trial court, not the agency record. *Nuernberg v. Tex. Emp't Comm'n*, 858 S.W.2d 364, 365 (Tex. 1993). Although the standard of review prohibits the trial court from simply reviewing the agency's record to determine if the decision is supported by substantial evidence, individual items from the agency's record may be introduced independently before the trial court as part of a de novo review. *Id.*

**Evidence Supporting TWC's Motion for Summary Judgment**

TWC attached to the motion for summary judgment the affidavits of Microconsult's President William Bryan, its Laboratory Director Amie Myers, and its Quality Assurance/Quality Control Manager Myla Tuazon, as well as parts of the TWC administrative record. *See id.*; *JMJ Acquisitions Mgmt., LLC v. Peterson*, No. 05-12-00263-CV, 2013 WL 2635961, at *3 (Tex. App.—Dallas June 13, 2013, no pet. h.).

Bryan detailed his experience in microbiology, including experience with the testing of cosmetics, over-the-counter drugs, and consumer products, as well as his familiarity with the FDA guidelines applicable to Microconsult's testing laboratory. He stated that Microconsult is an FDA-registered laboratory and is licensed to test class 2 and 3 controlled substances by the DEA. In addition, he said it "operates under good manufacturing practices and good laboratory practice regulations" and that its policy is "to ensure accurate and timely testing

6

services, and to continuously meet and/or exceed the expectations of [its] customers through the day-to-day interaction."

Bryan averred that Microconsult hired Paskauskiene on June 1, 2010 as a laboratory contractor to review test data and results for accuracy, including "to ensure the data was entered correctly on Microconsult, Inc.'s test results reports." Her "main job function" if there were mistakes in a test record was "to catch the mistakes and have the chemist or lab technician correct those mistakes." She was also to "sign the test record under the 'Reviewed By' section signifying that she had reviewed the ENTIRE test record and that all of the information thereon was accurate." According to Bryan, this procedure was required as good manufacturing practices to "protect[] the consumer from deleterious effects and protect[] and keep[] Microconsult, Inc. in regulatory compliance."

Bryan also stated that he had the authority to make hiring and firing decisions and to supervise disciplinary proceedings regarding Microconsult's employees.

According to Bryan, the following event prompted Paskauskiene's termination:

> On March 4, 2011, one of Microconsult, Inc.'s customers was at our offices to perform an audit for their own quality control standards. During this audit, the client noticed a mistake on a lab report Ms. Paskauskiene had reviewed and signed off on as being accurate in all respects. Specifically, the audit revealed that certain information on the subject client report concerning test data was incorrect. However, Ms. Paskauskiene had nonetheless signed the

7

report, representing that it had been reviewed by her for accuracy and that the entire report was accurate.

. . . Thus, on the afternoon of March 4, 2011, I called a meeting with Amie Myers, Microconsult's Laboratory Director, Myla Tuazon, Microconsult's Quality Assurance/Quality Control Manager and Ms. Paskauskiene. The purpose of this March 4, 2011 meeting was to discuss the mistake discovered by our client during their audit, which Ms. Paskauskiene had failed to notice. During the meeting, I asked Ms. Paskauskiene about the mistake revealed by the audit, which the customer had found, although Ms. Paskauskiene had approved the inaccurate report; and why she had approved such a report. Ms. Paskauskiene responded by stating that she never reviewed the entire test results reports as she did not have time. This meant that she was falsifying company testing records, including the subject report.

. . . Additionally, during the meeting, Amie Myers showed Ms. Paskauskiene several other test records containing mistakes which had been signed by Ms. Paskauskiene as being accurate even though such reports contained several mistakes. Ms. Myers had recently reviewed the reports during a routine company quality control audit in which random test results reports approved by Microconsult, Inc. employees, including Ms. Paskauskiene, were selected for further review. These reports could be reports that Ms. Paskauskiene or others had signed. When Ms. Myers asked Ms. Paskauskiene why there were so many test records from October with mistakes that she had nonetheless signed and approved, as an example of the mistakes found during the audit, Ms. Paskauskiene stated that maybe she was distracted during that time due to her birthday which is in October.

. . . Based on Ms. Paskauskiene's statement that she never reviewed the entire test records, I stated that the meeting was over. I knew at that time that Microconsult, Inc. would be required to terminate Ms. Paskauskiene because she was exposing Microconsult, Inc. and our customers to liability and had jeopardized customer relationships by not reviewing the entire test results reports as she was required to do, but nonetheless signed off on them claiming she had done so. She also violated company policy by falsifying documents. Thus, I made the decision that Ms. Paskauskiene would be terminated the following Monday morning, March 7, 2011, as it was past 5:00 p.m. on Friday. Ms.

8

Paskauskiene did not come in to work on March 7, 2011, due to an apparent doctor visit. Thus, we spoke on the phone the morning of March 8, 2011, wherein I informed Ms. Paskauskiene that she was terminated. I then e-mailed her the March 7, 2011 termination letter to her, which would have been given to her on March 7th if she had come into work. True and correct copies of my March 8 2011, e-mail and termination letter are attached hereto as Exhibits "C" and "D" and incorporated herein by reference.

. . . Ms. Paskauskiene also had a history of tardiness and cell phone use on company time for personal calls. These were also factors in Microconsult, Inc.'s decision to terminate Ms. Paskauskiene, but alone they would not have resulted in her termination at that time. The primary reason Ms. Paskauskiene was terminated was because she admittedly failed to review entire lab test results reports, but nonetheless signed off on such reports indicating that she had done so; and in doing so she falsified company records, subjected Microconsult, Inc. and its customers to liability and jeopardized Microconsult, Inc.'s company records and customer relationships.

The attached termination letter includes the following:

Your signature on the raw data form and certificate of analysis ensures that all data and results in the entire packet have been reviewed. When I asked you how you could miss the error, you stated that you usually do not review the entire document, yet you signed that you did. This is falsification of a company document, which as stated in the company policy that you signed, is an offense that results in immediate termination.

You have missed a significant number of mistakes on reports following your review and signature. It is your job and only job that you review the various chemistry chain of custody forms including data, signatures, etc. for the  certificate of analysis forms. You stated in your e-mail of March 4, 2011 that no deficiencies had ever been discussed with you previously. Amie Myers has brought the pink folders and sample packets to you several times a week for you to correct the items you missed.

9

Amie Myers averred that she had been the Laboratory Director of Microconsult for three years and, before that, the Laboratory Manager. She further detailed her training, experience, and responsibilities, including her familiarity with its practices. According to Myers,

> When Ms. Paskauskiene was first hired, I spent a full two weeks with her at a table in my office training her on reviewing documentation, chemistry methods, raw data, final reports and other ancillary training regarding her position. There were other staff members who witnessed this training. The President of Microconsult, William Bryan, also witnessed much of the training that occurred in my office. Ms. Paskauskiene's training is documented on numerous training forms which she signed and dated following her training. During Ms. Paskauskiene's training, I clearly explained to her that her job duties largely consisted of, among other things, fully reviewing data and test records to verify their accuracy. In this regard, I explained to Ms. Paskauskiene the fact that it was essential for Microconsult, Inc.'s test records to be accurate because inaccurate reports subject Microconsult, Inc. and its customers to liability and jeopardize Microconsult, Inc.'s customer relationships and safety to consumers. I also explained this to her at her initial job interview and on her first day of employment.

> . . . A significant part of my job duties is to perform internal quality control audits whereby I randomly audit test records generated and/or approved by Microconsult employees. In January of 2011, I performed such an audit concerning Microconsult's test records. These randomly selected test records from the Fall of 2010 were reports which Ms. Paskauskiene or another reviewer approved during the fourth quarter of 2010. Ms. Paskauskiene had reviewed, signed and dated the majority of these test records, allegedly confirming that she had reviewed the entire record. In my first performance review of Ms. Paskauskiene, on August 4, 2010, following her first two months of employment, I advised Ms. Paskauskiene that she needed to pay attention to detail and avoid mistakes, as well as other areas that were less than satisfactory. A true and correct copy of this August 4, 2010 performance review is attached hereto as Exhibit "B" and incorporated herein by reference.

10

. . . On March 4, 2011, an audit by one of Microconsult's customers revealed a mistake on a lab test record Ms. Paskauskiene had reviewed and signed off on as being accurate in all respects. Specifically, the client's audit revealed that information on the client's test record was incorrect. However, Ms. Paskauskiene had signed off on the report verifying its accuracy, in spite of the fact Ms. Paskauskiene later admitted she had not actually reviewed the entire test record.

. . . The customer audited Microconsult's procedures, methods, reports, etc. and had generally complimented us on our overall audit results and the manner in which we test by our procedures, etc. It was at the end of the audit that the customer found the mistake which Ms. Paskauskiene had missed even though she had signed the test records noting she had reviewed and verified its accuracy. The customer questioned Myla Tuazon and me as to how the mistake was made and then not caught on review.

. . . Thereafter, I attended a March 4, 2011 meeting with William Bryan, President of Microconsult, Myla Tuazon, the Quality Assurance Manager and Ms. Paskauskiene. The purpose of the meeting was to discuss the mistake discovered by the client during its audit, the mistake Ms. Paskauskiene had failed to catch. When Ms. Paskauskiene was asked about the mistake revealed by the client's audit, Ms. Paskauskiene stated that she never reviewed the entire test record as she did not have time.

. . . During the March 4, 2011 meeting, I also brought to Ms. Paskauskiene's attention test records from the routine internal audit that was in process, which is part of Microconsult's standard operating procedures and required by the FDA. In my internal audit, I had found many mistakes on various test records from the fourth quarter of 2010, which Ms. Paskauskiene had nonetheless reviewed, signed and dated memorializing that she had allegedly reviewed the entire test record and that they were accurate. It appeared she had not reviewed the entire test record as required because there were just too many errors missed on these test records. When I asked her why there were so many test records from October 2010 that contained errors that she had nonetheless signed and approved, as an example, she stated that maybe she was distracted during that time because it was her birthday.

An excerpt from Myers's attached review of Paskauskiene states, "Ensure you and others are keeping up with documentation, utilizing correct forms, thoroughly reviewing documentation before you initial or sign for reviewing paperwork. There are still lots of mistakes being caught during the review process."

Tuazon's affidavit corroborated Bryan's and Myers's accounts of what transpired on March 4, 2011.

Also attached to TWC's motion was a copy of the "appeals folder" from TWC, authenticated as a public record maintained by TWC by its custodian of records. Those records show that a TWC hearing examiner found, and the TWC appeals tribunal agreed, that Paskauskiene was discharged from Microconsult for "misconduct connected with the work." The appeals tribunal made the following findings of fact:

> The employer discharged the claimant on March 7, 2011 for violating known company policies, specifically regarding dishonesty and falsifying records. The employer had a disciplinary policy under which an employee would be dismissed for dishonesty and falsification of company records. The claimant knew the employer's policies in this regard having received and signed for a copy of the Employee Handbook before she began her employment on June 1, 2010.

> The claimant represented to her employer that she had reviewed each page of the reports which had been submitted to her. The employer learned from a customer audit that the claimant had not reviewed the reports as she had reported by her signature. The claimant admitted that she had misrepresented her reviews and had not fully reviewed the reports. The employer confronted the claimant about her violation of the employer's rules by letter on March 7, 2011 and discharged her.

12

The tribunal thus concluded (1) that, under applicable precedent, Paskauskiene committed misconduct by misrepresenting to Microconsult that she had properly reviewed the test reports, (2) that the test results were important to Microconsult's interests, and (3) that she should have known she was obligated to inform Microconsult correctly of her reviews. The tribunal found Microconsult's evidence that Paskauskiene said she did not review the reports in their entirety more persuasive than her testimony that she did not admit she violated Microconsult's policy.[5] The tribunal thus affirmed the hearing examiner's decision.

**Paskauskiene's Motion for Summary Judgment**

Paskauskiene's motion for summary judgment asserted that (1) the TWC decision was not supported by substantial evidence and was arbitrary, (2) there was no evidence she committed misconduct or falsified reports, and (3) TWC failed to consider or admit documents that she had timely filed. As part of her argument, she contended that TWC failed to consider that she was fired because of a "medically verified illness."

Paskauskiene attached an affidavit detailing her training and experience in FDA-regulated chemical testing. She said that Microconsult did not provide her adequate training for her position, that she was "very heavily overloaded with . . .

---

[5]TWC's records also indicate that Paskauskiene claimed that she always reviewed test results in their entirety, that she never said she did not, and that she was fired without warning when she emailed that she was sick on March 7, 2011 and could not come back to work until March 14, 2011.

13

work" and had to "review [an] unusual amount of data," that she caught many mistakes by others but was never told of any concerns about her work, that Microconsult created rules that only applied to her and forced her to work overtime, that she began to complain about her work environment prompting Microconsult to retaliate against her by performing "spot checks" of her work, and that the paperwork showed to her on March 4, 2011 could have been taken from her office and used without her permission and likely was not to be used for reporting purposes. She also averred that (1) she sent an email to Bryan the night of March 4, 2011 complaining that she was being retaliated against and (2) that she hurt her back that night moving sample boxes that she had packed. According to Paskauskiene, she was out on March 7, 2011 because of a doctor's appointment for that back injury.

Also attached is a separate affidavit from Paskauskiene stating the following:

> I brought this claim for unemployment benefits before the Texas Workforce Commission. I previously attended a hearing regarding my unemployment benefits before a hearing officer of the [TWC]. At my hearing, I was not permitted to discuss significant evidence in my favor as well as present exhibits that I had prepared for the hearing. I was also not permitted to testify on my own behalf despite my objections otherwise. I firmly believe that had I been allowed to present all my evidence and given a fair opportunity to rebut Microconsult's misconstrued allegations then the TWC hearing must have resulted in a decision in my favor.

> . . . Microconsult's claim that I falsified company documents is simply not true. At no point did I ever state that I "never read the reviews" as Microconsult claims. During my meeting with Microconsult management on March 4, 2011, I explained to William

14

Bryan, Amie Myers, and Myla Tuazon that the workload had become increasingly burdensome. I had requested assistance to keep up with the heightened pace of work. Microconsult, however, has misconstrued my statements from that meeting to conclude that I never reviewed the lab technicians' reports. This is wholly untrue because I have always reviewed the entirety of every report before signing it and have never admitted otherwise. More so, during my TWC hearings, Myla Tuazon and Amie Myers even specifically admitted that they did not believe I had intentionally falsified my reviews, see Exhibit M.

. . . Any errors that I may have committed during the course of my reviews would have been no more than the result of commonplace mistake, as opposed to falsification as Microconsult suggests. I worked hard while at Microconsult, as my former coworkers can attest, and I dutifully performed my duties within the best of my abilities. With the constant exchange of papers that occurs every day at Microconsult, the company's lack of organization, and the rapid turnaround speed expected of us, it would have been close to impossible for any reviewer to catch all mistakes when reviewing the lab technicians' reports. I have never been reported for workplace misconduct that would otherwise suggest I might have falsified reports and I consistently performed to company expectations.

The trial court sustained numerous objections to other summary judgment evidence proffered by Paskauskiene; she does not complain about any specific ruling on appeal. Thus, we will discuss only the evidence that the trial court considered. *See* Tex. R. App. P. 33.1; *Cammack the Cook, L.L.C. v. Eastburn*, 296 S.W.3d 884, 889 (Tex. App.—Texarkana 2009, pet. denied).

**Analysis**

A person is "disqualified for benefits if [she] was discharged for misconduct connected with [her] last work." Tex. Lab. Code Ann. § 207.044(a) (West 2006). Labor code section 201.012(a) defines "misconduct" as "mismanagement of a

15

position of employment by action or inaction, neglect that jeopardizes the life or property of another, intentional wrongdoing or malfeasance, intentional violation of a law, or violation of a policy or rule adopted to ensure the orderly work and the safety of employees." *Id.* § 201.012(a).

The TWC appeals tribunal found, and TWC presented summary judgment evidence, that Microconsult's company policy provided for termination upon dishonesty or falsification of records, that Paskauskiene's signature on a test report indicated that she had reviewed the entire document, that she admitted she signed at least one such report without reviewing the entire document, and that Microconsult's review procedure was required by good manufacturing practices to protect consumers and ensure that Microconsult was in regulatory compliance. We conclude and hold that, based on the above, the trial court properly held as a matter of law that substantial evidence supports TWC's decision to deny benefits to Paskauskiene. *See Burton v. Tex. Emp't Comm'n*, 743 S.W.2d 690, 693 (Tex. App.—El Paso 1987, writ denied); *see also* Tex. Workforce Comm'n, *Appeals Policy & Precedent Manual* § 140.25(3)–(4) Dishonesty: Falsification of Record, TWC Appeal No. 3276-CA-76 (Oct. 1, 1996), *available at* http://www.twc.state.tx.us/ui/appl/mc.pdf (denying benefits when claimant was discharged for placing supervisor's initials on expense account on one occasion and, on four other occasions, had some other person or persons place the supervisor's initials on expense accounts, because even though claimant was entitled to reimbursement, he had known that his

16

supervisor was supposed to approve such expense accounts).  Moreover, although Paskauskiene asserted in her motion for summary judgment and in her response to TWC's motion for summary judgment that the TWC hearing officer did not allow her to testify or present certain evidence on her behalf, she did not specify which testimony or evidence she was not allowed to present, nor can we consider the evidence the trial court did not consider because it granted TWC's objections to it.  *E.g.*, *Kaufman v. Islamic Soc'y of Arlington*, 291 S.W.3d 130, 137 (Tex. App.—Fort Worth 2009, pet. denied).

We conclude and hold that the trial court did not err by granting TWC's motion for summary judgment and denying Paskauskiene's.  We overrule her third and fourth issues.

## Jury Demand

In her first issue, Paskauskiene contends that the trial court erred by denying her a jury trial because she filed a jury demand and because she was entitled to a de novo jury trial of her claim under section 2001.173(b) of the government code.  Tex. Gov't Code Ann. § 2001.173(b) (West 2008) ("On demand, a party to a trial de novo review may have a jury determination of each issue of fact on which a jury determination could be obtained in other civil suits in this state.").  By its plain language, section 2001.173(b) provides for a jury trial under the same circumstances as it could be obtained in other civil suits.  *Id.*  A party does not have an absolute right to a jury trial in a civil case. *See Green v. W.E. Grace Mfg. Co.*, 422 S.W.2d 723, 725 (Tex. 1968); *Vann v. Gaines*, No. 02-

17

06-00148-CV, 2007 WL 865870, at *3 (Tex. App.—Fort Worth Mar. 22, 2007, no pet.) (mem. op.). Summary judgment is a procedure that may be used to dispose of a case when there are no genuine issues of material fact and only questions of law exist. *See Green*, 422 S.W.2d at 725; *Vann*, 2007 WL 865870, at *3. When, as here, no such issues of fact exist to submit to a jury, the granting of summary judgment will not violate a party's constitutional right to a jury trial. *See Green,* 422 S.W.2d at 725; *Vann*, 2007 WL 865870, at *3. Accordingly, we overrule Paskauskiene's first issue.

## Conclusion

Having overruled Paskauskiene's four issues, we affirm the trial court's judgment.


TERRIE LIVINGSTON
CHIEF JUSTICE

PANEL:  LIVINGSTON, C.J.; MEIER and GABRIEL, JJ.

DELIVERED:  August 8, 2013

18